Robert P. Goe – SBN 137019
Stephen P. Reider – SBN 287820
GOE & FORSYTHE, LLP
18101 Von Karman Ave., Ste. 510
Irvine, CA 92612
Email: rgoe@goeforlaw.com
sreider@goeforlaw.com
Telephone: (949) 798-2460
Facsimile: (949) 955-9437

*Attorneys for Playhut, Inc.*

Rom Bar-Nissim (CA 293356)
FOX ROTHSCHILD LLP
10250 Constellation Place Ste. 900
Los Angeles, CA  90067-1506
Tel:  310-598-4150
Fax: 310-556-9828
Email: rbar-nissim@foxrothschild.com

Mette H. Kurth (CA 187100/DE 6491)
FOX ROTHSCHILD LLP
919 North Market Street, Ste. 300
Wilmington, DE 19899-2323
Tel: 302-654-7444
Fax: 302-656-8920
mkurth@foxrothschild.com

*Counsel for the Official Committee of Unsecured Creditors*

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### LOS ANGELES DIVISION

In re:

**PLAYHUT, INC.,**

Debtor and Debtor-in-Possession.

Case No. 2:18-bk-15972-WB

Chapter 11

**EMERGENCY MOTION FOR ENTRY OF AN ORDER: (A)(I) SCHEDULING A HEARING ON THE APPROVAL OF THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (II) APPROVING CERTAIN BIDDING PROCEDURES, ASSUMPTION AND ASSIGNMENT PROCEDURES, AND THE FORM AND MANNER OF NOTICE THEREOF, AND (III) GRANTING RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE AGREEMENT, (II) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY**

**CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

**Hearing Date**

| | |
|---|---|
| Date: | September 17, 2018 |
| Time: | 11:00 a.m. |
| Place: | Courtroom 1375, 13th floor |
| | 255 E. Temple Street |
| | Los Angeles, CA  90012 |

Playhut, Inc. (the "**Debtor**" or "**Playhut**") and the Official Committee of Unsecured Creditors of Playhut, Inc. (the "**Committee**") hereby submit this joint motion (the "**Motion**"), pursuant to Bankruptcy Code sections 105, 363, 365, 503 and 507, for the entry of: (a) an order, substantially in the form attached hereto as Exhibit A (the "**Bidding Procedures Order**"), (i) scheduling a hearing (the "**Sale Hearing**") on approval of the sale of all or substantially all of Playhut's assets (collectively, the "**Assets**"), or subsets thereof, free and clear of all liens, claims, encumbrances, and other interests (collectively, the "**Encumbrances**"), and authorizing the assumption and assignment of certain executory contracts and unexpired leases (each, a "**Contract**," and collectively, the "**Contracts**") in connection therewith; (ii) authorizing and approving certain bidding procedures for the sale (collectively, the "**Bidding Procedures**," a copy of which is attached as Exhibit 1 to the Bidding Procedures Order),[1] certain procedures for the assumption and assignment of the Contracts (collectively, the "**Assumption and Assignment Procedures**"), and the form and manner of notice thereof; and (iii) granting related relief; and (b) an order (i) authorizing and approving Playhut's entry into an asset purchase agreement or agreements for the Assets (each, a "**Purchase Agreement**");[2] (ii) authorizing and approving the sale of Playhut's assets (the "**Sale**") free and clear of all Encumbrances other than those permitted by the subject Purchase Agreement; (iii) authorizing and approving the assumption and assignment of any Assumed Contacts identified

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Bidding Procedures.

[2] A form Purchase Agreement and a proposed form of sale order will be made available to potential bidders in the confidential Data Room (as defined herein).

2

in the Purchase Agreement(s); and (iv) granting related relief. In support of this Motion, Playhut and the Committee (the "Movants") respectfully state as follows:

## PRELIMINARY STATEMENT[3]

78.     Playhut was founded in 1992 and is committed to producing toys, allowing children to play in imaginative and educational ways. Playhut's EZ Twist$^{TM}$ product line consists of indoor and outdoor play structures, baby structures, dolls, and plushes that incorporate interactive features such as games and themed environment, manufactured primarily in China.

79.     Playhut has grown into a toy producer with significant market share of toy structures and other products for primarily the toddler age range. Playhut has relationships with major retailers such as Wal-Mart, Canadian Tire, and Amazon, and licensed brands such as Disney that solidify Playhut's position in the international marketplace.

80.     On May 24, 2018, Playhut commenced this chapter 11 case by filing a voluntary petition for bankruptcy. Preferred Bank holds senior liens against Playhut secured by Playhut's assets, with total outstanding indebtedness in the approximate amount of $6,152,613.59.

81.     Playhut and the Committee, in consultation with Preferred Bank, have concluded that an immediate sale of all or substantially all of Playhut's assets is the best path forward as it will maximize the value of the estate for the benefit of all creditors. A sale of its assets under section 363(f) of the Bankruptcy Code through a market-tested process will provide an opportunity to de-lever the financial burdens on Playhut's business imposed by its existing debt-load and legacy debts. Playhut's assets include certain surplus inventory that is not essential to its future operations. Playhut is therefore offering its Assets for sale in any combination. Potential bidders will be free to bid on only the operating assets, the surplus inventory, or both.

82.     It is imperative that this sale take place immediately. First, during the course of due diligence, various interested buyers have indicated that industry timelines require a sale closing by no later than September 25, 2018. The Toy Association's "Fall Toy Preview" conference will take

---

[3] Additionally, capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration (as defined below).

ACTIVE\64185774.v3-9/12/18

place this year from October 2-4, 2018 in Dallas Texas. Conference registration starts on September 30, 2018. These conference deadlines create a very real sense of urgency for buyers. In addition, toy manufacturers are currently scheduling meetings for fall 2019 production programs. Meetings with overseas suppliers to secure inventory production are also happening now. And Playhut's licensors will need time to digest and vet the "new" Playhut postacquisition and to respond to requests to renew licensing agreements for the newly acquired company and its buyer. The window in which any buyer can take over the Playhut operation and prepare for 2019 is rapidly closing.  Second, Preferred Bank has expressed considerable concern about a deteriorating collateral position. It has extended the use of cash collateral only through September 20, 2018.  And in view of the deadlines above, Playhut and the Committee believe that any flexibility in that deadline is extremely limited.

83.    Accordingly, through the marketing and sales process described below, Playhut seeks to solicit immediate interest in its Assets through all means possible in the very limited window available to it in an effort to generate the highest and best return for creditors and estate constituents.

## JURISDICTION AND VENUE

84.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

85.    The statutory and legal predicates for the relief sought herein are sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Bankruptcy Rules 6004-1 and 9013-1.

## BACKGROUND

86.    On May 24, 2018 (the "**Petition Date**"), Playhut commenced a voluntary case under chapter 11 of the Bankruptcy Code. Playhut is authorized to operate its business and manage its property as a debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No request has been made for the appointment of a trustee or an examiner.

4

ACTIVE\64185774.v3-9/12/18

## RELIEF REQUESTED

87.    By this Motion, the Movants seek entry of: (a) the Bidding Procedures Order (i) scheduling a date for the Sale Hearing, (ii) authorizing and approving the Bidding Procedures and the Assumption and Assignment Procedures and the form and manner of notice thereof, and (iii) granting related relief; and (b) the Sale Order (i) authorizing and approving Playhut's entry into a Purchase Agreement with a Successful Bidder, (ii) authorizing and approving the Sale, free and clear of all Encumbrances, (iii) authorizing and approving the assumption and assignment of the Assumed Contacts to any Successful Bidder; and (iv) granting related relief.

88.    The auction process is for a sale of substantially all of the Assets, or components thereof, including but not limited to (a) Playhut's current inventory, lease, customer lists, licensing agreements and other executory contracts, accounts receivable, and intellectual property[4]; and (b) Playhut's surplus inventory.  Any of the foregoing shall be referred to as a "**Transaction.**"

89.    All due diligence inquiries regarding the Assets should be directed to Playhut's Chief Restructuring Officer ("**CRO**"), James Wong at jwong@armoryconsulting.com or (714) 222-5552 or Playhut's bankruptcy counsel Robert Goe at rgoe@goeforlaw.com or (949) 798-2460.

**A.    Sale Process**

13.    Playhut's CRO and counsel and the Committee have been informed and believe that Playhut's sole director, officer and equity holder, Brian Zheng, was in discussions with potential buyers as early as 2016 and continuing through June 2018. The Court appointed Mr. Wong as Playhut's CRO effective as of July 11, 2018. Shortly after his appointment, Mr. Wong began evaluating the prospects for a possible sale process. Starting on or about August 2018, Mr. Wong began discussions with various parties who had expressed interest in acquiring some or all of the

---

[4] The purchased Assets do not include patents and other intellectual property that Playhut licenses from its non-debtor affiliate, Patent Category Corporation ("PCC"). Playhut does not believe that such patents and intellectual property are used in its current operations. However, in addition to an assignment of the license agreement from Playhut, Preferred Bank has indicated that it is willing to include an assignment of a note and security agreement granting Preferred Bank a security interest in all or substantially all of PCC's assets.

ACTIVE\64185774.v3-9/12/18

Assets, including buyers interested in purchasing surplus inventory as well as buyers interested in purchasing Playhut as a going concern.

14.    As a result of discussions with various buyers, Playhut's personnel, buyers and buyer representatives, and suppliers, Mr. Wong has concluded that industry timelines require a sale closing by no later than September 25, 2018. Among other things, the Toy Association's "Fall Toy Preview" conference will take place this year from October 2-4, 2018 in Dallas Texas. Conference registration starts on September 30, 2018. In addition, toy manufacturers are currently scheduling meetings for fall 2019 production programs. Meetings with overseas suppliers to secure inventory production are also happening now. And Playhut's licensors will need time to digest and vet the buyer and to respond to requests to renew licensing agreements.

15.    Accordingly, Playhut is gearing up for a "fast-track" sale process. Playhut has consulted with the Committee, which supports this "fast-track" process as indicated by its joining in this Motion as a moving party.  Preferred Bank has also been consulted and has indicated its support. Playhut believes that the most likely buyer for the company will be a strategic buyer rather than a financial investor who is not familiar with this industry segment. To solicit as much possible interest in the very compressed timeframe available, Playhut intends to reaching out to potential buyers through the Committee and it will be using its sales-broker network, which has deep connections in the toy industry, to alert strategic investors to this opportunity and promote interest in the auction. In addition, Playhut's CRO intends to contact current licensees.  Playhut has a functional "data room" at the ready and it has a good deal of due diligence material readily available. One of Playhut's strengths is its ability to rapidly prepare updated information such as inventory updates and financial data, as Playhut has a robust ERP system, Sage, and the staff are adept at downloading and culling various types of reports.  Playhut will welcome any site visits and personnel interviews on a compressed timeframe and can also facilitate discussions with key licensors for prospective bidders.

16.    Playhut believes that the process proposed hereby is designed to generate maximum interest in the Assets within the limited time available by offering maximum flexibility with respect to Sale proposals. Playhut developed the Bidding Procedures in consultation with its professional

ACTIVE\64185774.v3-9/12/18

advisors and the Committee's advisors and in consultation with its secured lender.  It has designed the Bidding Procedures to preserve flexibility in this marketing process and generate the greatest level of interest and the highest or best value for the Assets on an expedited timeline.

**B.** **Stalking Horse Purchaser**

17.    By this Motion and in connection with the Bidding Procedures, Playhut requests authority, but not direction, to enter into an agreement (a "**Stalking Horse Agreement**") with an interested bidder to serve as the stalking horse bidder (the "**Stalking Horse Purchaser**") to acquire substantially all of the operating Assets on a going-concern basis. A Stalking Horse Purchaser will aid Playhut in its sale process by providing a baseline from which other interested parties may bid, will ensure continuity of Playhut's business for its customers, employees and vendor base, and will result in a firm commitment to consummate a Transaction and definite consideration on which Playhut can begin to formulate a resolution of this chapter 11 case.  Playhut believes that a Stalking Horse Agreement would take the form of a going-concern buyer interested in acquiring the operating Assets through a sale.

18.    **Stalking Horse Agreement Notice**. If Playhut—in consultation with the Committee, Preferred Bank, and if Mr. Zheng will not be participating as a potential bidder or plan proponent, (collectively, the "**Consultation Parties**")—enters into any Stalking Horse Agreement that it determines is in the best interests of Playhut and its estate, Playhut will file with the Court, and serve on the Motion Notice Parties (as defined below), a notice (a "**Stalking Horse Notice**") that shall include the following: (a) the identification of the Stalking Horse Purchaser, including any affiliations with Playhut; (b) the Assets that are the subject of the Stalking Horse Agreement; (c) a copy of the Stalking Horse Agreement(s);[5] (d) the purchase price provided for in the Stalking Horse Agreement; (e) any proposed Bid Protections (as defined below); and (g) the deposit paid by the Stalking Horse Purchaser.

---

[5] The Stalking Horse Notice that is served on the Motion Notice Parties (as defined below) need not attach a copy of the proposed Stalking Horse Agreement but, instead, shall indicate the manner in which the Motion Notice Parties may obtain a copy of the proposed Stalking Horse Agreement.

ACTIVE\64185774.v3-9/12/18

19. **Stalking Horse Bid Protections**. As a condition to entering into the Stalking Horse Agreement, a Stalking Horse Purchaser may request reasonable bid protections, including either or both of a "**Break-Up Fee**" and an "**Expense Reimbursement**" (together "**Bid Protections**"). If the CRO, in consultation with the Consultation Parties, approves a Stalking Horse Agreement proposal prior to the initial hearing on this Motion, Playhut will file a supplement to this Motion seeking authority to designate such agreement as a Stalking Horse Agreement and approving the Bid Protections.

20. If after the conclusion of the initial hearing on this Motion, no Stalking Horse Purchaser has been designated, Playhut seeks authority to continue to negotiate with and designate parties as a Stalking Horse Purchaser. Playhut is requesting authority to designate, after the entry of the Bidding Procedures Order, a Stalking Horse Purchaser and Stalking Horse Agreement without further Court order so long as the following parameters are satisfied: (a) the Break-Up Fee does not exceed 3% of the aggregate cash purchase price; (b) the Expense Reimbursement does not exceed $25,000; and (c) the Consultation Parties affirmatively consent to the stalking horse designation on or prior to September 18, 2018 (the "**Stalking Horse Deadline**").[6]

C.    **Bidding Procedures**[7]

21. The Bidding Procedures describe, among other things: (i) the Assets available for sale and the means by which interested parties may obtain additional information with respect thereto, (ii) the manner in which bids become "qualified," (iii) the coordination of diligence efforts among the bidders and Playhut, (iv) the receipt and negotiation of bids received, (v) the conduct of any Auction(s), and (vi) the selection and approval of the Successful Bidder and the selection of the Back-Up Bidder. Certain of the key terms of the Bidding Procedures, which shall apply to each

---

[6] Failure to meet any of the foregoing conditions shall not preclude Playhut from seeking Court authorization to designate a Stalking Horse Purchaser and Stalking Horse Agreement.

[7] If there is any conflict between any summary contained herein and the terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order, the terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order shall control. Capitalized terms used but not defined in this summary of the Bidding Procedures shall have the meanings ascribed to such terms in the Bidding Procedures.

ACTIVE\64185774.v3-9/12/18

Potential Bidder, the Qualifying Bidders, the submission, receipt, and analysis of all bids relating to any proposed Transaction, and the conduct of the Auction, are included below:

(a) **Qualification as Bidder**: Any person or entity that wishes to participate in the bidding process for the Assets (each, a "**Potential Bidder**") must first become a "**Qualifying Bidder**."

To become a Qualifying Bidder (and thus be able to conduct due diligence and gain access to Playhut's confidential electronic data room concerning the Assets (the "**Data Room**")), a Potential Bidder must submit to Playhut: (i) documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated Transaction; (ii) an executed confidentiality agreement in form and substance reasonably satisfactory to the Playhut, which by its terms will inure to the benefit of the Successful Bidder(s); (iii) a statement and other factual support demonstrating to Playhut's reasonable satisfaction that the interested party has a *bona fide* interest in consummating a Transaction; and (iv) sufficient information, as determined by Playhut, to allow it to determine that the interested party (i) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a Transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to Playhut in its discretion) and (ii) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by Playhut and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with a Transaction.

Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) any designated Stalking Horse Purchaser shall be considered a Qualifying Bidder, and a Stalking Horse Agreement shall be considered a Qualifying Bid (as defined below); and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, Playhut may consider a combination of bids for the Assets.

(b) **Due Diligence**: Playhut will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that it believes to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to: Playhut's CRO James Wong at jwong@armoryconsulting.com or (714) 222-5552, or Playhut's bankruptcy counsel Robert Goe at rgoe@goeforlaw.com or (949) 798-2460

The due diligence period shall extend through and including the Bid Deadline. Playhut may, but shall not be obligated to, in its sole discretion, furnish any due diligence information after the Bid Deadline. Playhut reserves the right, in its reasonable discretion, to withhold or limit access to any due diligence information that it determines is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder. Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any

9

due diligence information, Playhut and its estate shall be authorized to provide due diligence information to Qualifying Bidders provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to Playhut. Playhut and its estate is not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures and a contemplated Transaction.

**(c)**     **Bid Requirements**:

i.     *Qualifying Bid*. Other than in the case of a bid submitted by the Stalking Horse Purchaser, to be deemed a Qualifying Bid, a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements, as determined by Playhut's CRO in consultation with the Consultation Parties (each, a "**Bid Requirement**"):

a.     be in writing;

b.     fully disclose the identity of the Qualifying Bidder (and any other party participating in the bid) and provide the contact information of the specific person(s) whom Playhut or its advisors should contact in the event that Playhut has any questions or wishes to discuss the bid submitted by the Qualifying Bidder;

c.     set forth the purchase price to be paid by such Qualifying Bidder;

d.     if a bid includes a credit bid under section 363(k), evidence of the amount of the claim, the Assets constituting the collateral securing the claim, and evidence of the grant, perfection, priority, and validity of the lien (the "Secured Claim Documentation");

e.     state the liabilities proposed to be paid or assumed by such Qualifying Bidder;

f.     specify the Assets that are included in the bid and, to the extent a Stalking Horse Purchaser is designated, state that such Qualifying Bidder offers to purchase the Assets, or a number or combination of the Assets, upon substantially the same terms as, or terms more favorable to the Playhut and its estate than, the terms set forth in the Stalking Horse Agreement, as applicable;

g.     state that such Qualifying Bidder's offer is formal, binding and unconditional and is irrevocable until two (2) business days after the closing of the sale of the Assets;

h.     state that such Qualifying Bidder is financially capable of consummating the Transaction contemplated by the bid and provide written evidence in support thereof;

10

i.    contain such financial and other information to allow Playhut and the Consultation Parties to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the proposal, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows Playhut to serve, no later than September 19, 2018, such information on any counterparties to any contracts or leases being assumed and assigned (or assumed) in connection with the Transaction that have requested, in writing, such information;

j.    identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the contemplated transaction(s);

k.    specify whether the Qualifying Bidder intends to operate all or a portion of Playhut's business as a going concern;

l.    if the Transaction contemplated by the proposal is a sale, a commitment to close the Transaction by September 25, 2018;

m.    not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement or similar type of fee or payment;

n.    in the event that there is a Stalking Horse Purchaser, the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (A) the purchase price under the Stalking Horse Agreement, (B) any Break-Up Fee, (C) any Expense Reimbursement, and (D) $25,000 (the "**Minimum Initial Bid**");

o.    not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval or due diligence;

p.    contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the

11

completeness of any documents or other information provided in connection with the Bidding Procedures and the proposed Transaction;

q.    provides for the Qualifying Bidder to serve as a backup bidder (the "**Back-Up Bidder**") if the Qualifying Bidder's bid is the next highest and best bid (the "**Back-Up Bid**") after the Successful Bid (as defined below);

r.    includes written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the subject term sheet;

s.    provides a good faith cash deposit (the "**Deposit**") in an amount equal to ten percent (10%) of the purchase price provided for in the proposal (or such additional amount as may be determined by Playhut in its reasonable discretion and in consultation with the Consultation Parties) to be deposited, prior to the Bid Deadline, with an escrow agent selected by Playhut (the "**Escrow Agent**") pursuant to the escrow agreement to be provided by Playhut to the Qualifying Bidders (the "**Escrow Agreement**"); and

t.    provides for liquidated damages in the event of the Qualifying Bidder's breach of, or failure to perform under, the modified Purchase Agreement equal to the amount of the Deposit.

Playhut reserves the right, in consultation with the Consultation Parties, to negotiate with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

ii.    <u>Bid Deadline</u>. A Qualifying Bidder, other than any Stalking Horse Purchaser, that desires to make a bid shall deliver a written and electronic copy of its bid in <u>both</u> PDF and MS-WORD format to the Notice Parties so as to be received on or before **September 19, 2018 at 12:00 p.m. (PT)** (the "**Bid Deadline**"); *provided* that Playhut may extend the Bid Deadline without further order of the Court, subject to providing notice to the Consultation Parties. To the extent that the Bid Deadline is extended for all parties, Playhut shall file a notice on the docket of this chapter 11 case indicating the same. **Any party that does not submit a bid by the Bid Deadline (including as extended in**

ACTIVE\64185774.v3-9/12/18

**accordance with the prior two sentences) will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.**

    iii.    *Evaluation of Qualifying Bids*. Playhut will deliver by no later than 5:00 p.m. (PT) on the day of the Bid Deadline, copies of all bids from Qualifying Bidders to each of the Consultation Parties.

        Playhut, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid, and shall notify all Qualifying Bidders whether their bids have been determined to be a Qualifying Bid by no later than 12:00 p.m. (PT) on the day before the commencement of the Auction. In the event that a bid is determined not to be a Qualifying Bid, including with respect to any proposed credit bid amount, the Qualifying Bidder shall be notified by Playhut and shall have until the commencement of the Auction to modify its bid to increase the purchase price or otherwise improve the terms of the Qualifying Bid for Playhut and to provide additional Secured Claim Documentation; provided that any Qualifying Bid may be improved at the Auction as set forth herein.

        Prior to commencing the Auction, Playhut shall determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (the "**Baseline Bid**" and the Qualifying Bidder submitting the Baseline Bid, the "**Baseline Bidder**"), and shall notify any Stalking Horse Purchaser and all Qualifying Bidders with Qualifying Bids of the Baseline Bid no later than the opening of the Auction.

    iv.    *No Qualifying Bids*. If no timely Qualifying Bids other than any Stalking Horse Purchaser's Qualifying Bid are submitted on or before the Bid Deadline, Playhut shall not hold an Auction and may request at the Sale Hearing that the Stalking Horse Purchaser (if any) be deemed the Successful Bidder (as defined herein) and that the Court approve the Stalking Horse Agreement (if any) and the transactions contemplated thereunder.

    **(d)**    **Right to Credit Bid**. Any Qualified Bidder who has a valid and perfected lien on any Assets of Playhut's estate that is not subject to an objection by the commencement of the Auction (a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claim within the meaning of section 363(k) of the Bankruptcy Code and to the extent demonstrated by the Secured Claim Documentation; provided that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured.

    i.    *Secured Lender Bid.* Preferred Bank's credit bid rights are preserved. Preferred Bank shall qualify as an overbidder for the full amount of its secured claim as of the date of its bid. Preferred Bank shall not be required to assume any leases or executory contracts to overbid. Preferred Bank shall not be required to provide proof of board authorization to overbid. Preferred

13

Bank shall not be required to provide a cash deposit to overbid.  Preferred Bank's rights against Playhut's estate and any other liable party are preserved, except to the extent that a credit bid works a credit against Preferred Bank's claims against the estate.   Preferred Bank will notify Playhut and the Committee of any such credit bid, but reserves the right to evaluate all bids, including any overbids, prior to the time of deciding whether it will make an overbid, at any time prior to the completion of the Auction, and may make a credit bid at the Auction.

**(e)**    **Auction**. If Playhut timely receives one or more Qualifying Bids for any of the Assets (inclusive of any Stalking Horse Purchaser's Qualifying Bid), then Playhut shall conduct an auction (the "Auction"). Following the Auction, Playhut will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors:

i.    the terms of the Purchase Agreement requested by each bidder;

ii.    the extent to which such terms are likely to delay closing of the Sale, the cost to Playhut and its estate of such modifications or delay, and any incremental financing being offered to accommodate any delay;

iii.    the total consideration to be received by Playhut and its estate;

iv.    the Transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval;

v.    the net benefit to Playhut's estate, taking into account any Break-Up Fee and any Expense Reimbursement provided for in any applicable Stalking Horse Agreement;

vi.    the impact on employees, trade creditors and lease and contract counterparties; and

vii.    any other factors Playhut or the Consultation Parties may reasonably deem relevant.

The Auction shall be governed by the following procedures:

i.    the Auction shall commence on **September 21, 2018 at 9:00 a.m. (PT)** (the "**Auction Date**"), at Goe & Forsythe, LLP, 18101 Von Karman, Suite 1200, Irvine, CA 92612;

ii.    only a Stalking Horse Purchaser and the other Qualifying Bidders with Qualifying Bids (collectively, the "**Auction Bidders**") shall be entitled to make any subsequent bids at the Auction;

14

ACTIVE\64185774.v3-9/12/18

iii.    the Auction Bidders shall appear in person at the Auction, or through a duly authorized representative;

iv.    only Playhut, the Auction Bidders, the Consultation Parties, and Playhut's creditors and equity holders, together with the professional advisors to each of the foregoing parties, may attend the Auction; provided that any creditors, other than members or representatives of the Committee, desiring to attend the Auction must provide counsel for Playhut one business day's written notice of their intent to attend the Auction;

v.    Playhut and its professional advisors shall direct and preside over the Auction;

vi.    the Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction or the Sale;

vii.    bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids, with the first such bid to be at least equal to the Minimum Overbid Amount and all subsequent successive bids to be in increments of at least $25,000 (the "**Bid Increment**"); _provided_ that Playhut shall retain the right to modify the bid increment requirements on the record at the Auction in consultation with the Consultation Parties;

viii.    the Auction may include individual off-record negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

ix.    all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and Playhut shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding Playhut's announcement of the then-current highest and best bid;

x.    Playhut, in consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (_e.g.,_ the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any applicable order of the Court entered in connection with these chapter 11 cases, including, without limitation, the Bidding Procedures Order, and (ii) disclosed to the Auction Bidders;

xi.    each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining

15

any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

xii.    Auction Bidders shall have the right to make additional modifications to their respective Purchase Agreements or any Stalking Horse Agreement, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in Playhut's discretion, in consultation with the Consultation Parties, be less favorable to Playhut and its estate than the terms of the Auction Bidders' respective Purchase Agreements or any Stalking Horse Agreement, as applicable, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Back-Up Bid, which shall remain binding as provided for herein;

xiii.    Playhut and the Consultation Parties shall have the right to request any additional financial information that will allow Playhut and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal or any Stalking Horse Agreement, as applicable, as may be amended during the Auction, and any further information that Playhut may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

xiv.    upon the conclusion of the Auction, Playhut shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets that is or are the highest or best from among the Qualifying Bids submitted at the Auction, which may be a Stalking Horse Agreement (the "**Successful Bid**"). In making this decision, Playhut shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the likelihood of the bidder's ability to close a transaction and the timing thereof, the nature and impact of any variances from the form Purchase Agreement requested by each bidder, and the net benefit to Playhut's estate. The bidder submitting such Successful Bid, which may be the Stalking Horse Purchaser, shall become the "**Successful Bidder**," and shall have such rights and responsibilities of the purchaser as set forth in the subject Purchase Agreement, as applicable. Playhut may, in its sole discretion subject only to consultation with the Consultation Parties, designate Back-Up Bids (and the corresponding Back-Up Bidders) to purchase the Assets in the event that the Successful Bidder does not close the Sale; and

xv.    prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

16

**THE SUCCESSFUL BID AND ANY BACK-UP BIDS SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED. EACH QUALIFYING BID THAT IS NOT THE SUCCESSFUL BID OR BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, IF THE SUCCESSFUL BID IS IN THE FORM OF A RESTRUCTURING TERM SHEET, ANY BACK-UP BID SHALL REMAIN IRREVOCABLE AND BINDING ON THE BACK-UP BIDDER UNTIL TWO (2) BUSINESS DAY AFTER THE ENTRY OF AN ORDER CONFIRMING THE SUCCESSFUL BID IN THE FORM OF A RESTRUCTURING TERM SHEET AS THE SUCCESSFUL BID (OR SUCH FURTHER PERIOD SET FORTH IN ANY ORDER ENTERED AT THE SALE HEARING).**

**(f)**    **Sale Hearing**. The Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of any Stalking Horse Purchaser is received, then the Stalking Horse Agreement) will be subject to approval by the Court. The hearing to approve such Successful Bid and any Back-Up Bid (the "Sale Hearing") shall take place, subject to the Court's availability, on **September 24, 2018**.  The Sale Hearing may be adjourned by Playhut from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a hearing agenda or notice on the docket of Playhut's chapter 11 case. **For the avoidance of doubt, by no later than the time of announcement of the Baseline Bid for the Auction, Playhut may determine, in consultation with the Consultation Parties, to withdraw the Assets or any subset thereof, from the Auction and sale process, and adjourn the Sale Hearing with respect to these Assets on the terms set forth herein.**

At the Sale Hearing, Playhut will seek entry of an order that, among other things:

i.    authorizes and approves the Sale to the Successful Bidder (and, if applicable the Back-Up Bidder), pursuant to the terms and conditions set forth in the applicable Stalking Horse Agreement or Purchase Agreement executed by the Successful Bidder (and, if applicable the Back-Up Bidder), and that the Assets being transferred in such transaction shall be transferred free and clear of all liens claims and Encumbrances pursuant to section 363(f) of the Bankruptcy Code;

ii.    unless otherwise ordered by the Court, directing that all Encumbrances on the Assets that are sold shall attach to the cash proceeds generated from the sale of such Assets in the same order of priority as they existed prior to the consummation of such sale;

iii.     finding that the Stalking Horse Purchaser or Successful Bidder, as applicable, is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code; and

iv.     as appropriate, exempting the Sale(s) and conveyance(s) of the Assets from any transfer tax, stamp tax or similar tax, or deposit under any applicable bulk sales statute.

**(g)**     **Back-Up Bidder**. Notwithstanding any of the foregoing, in the event that the Successful Bidder fails to close the Sale by September 25, 2018 (or such date as may be extended by Playhut, in consultation with the Consultation Parties, and with the agreement of the Back-Up Bidder), the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and Playhut will be authorized, but not directed, to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties, as soon as practicable, but not later than September 27, 2018.

**(h)**     **Return of Deposits**. All Deposits shall be returned to each bidder not selected by Playhut as the Successful Bidder or the Back-Up Bidder no later than three (3) business days following the conclusion of the Sale Hearing. The deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale. If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Purchase Agreement or any Stalking Horse Agreement, as applicable, Playhut and its estate shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to Playhut and its estate for such breach or failure to perform.

**(i)**     **Reservation of Rights**. Notwithstanding any of the foregoing, Playhut reserves the right to, after consultation with the Consultation Parties, modify these Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, allow for bidding on only a portion of the Assets and not all of them, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing.

22.     The Bidding Procedures establish the following key dates for the sale process:

| | |
|---|---|
| Bidding Procedures Hearing | September 17, 2018 |
| Stalking Horse Designation Deadline | September 18, 2018 |

18

| Bid Deadline | 12:00 p.m. PT, September 19, 2018 |
| --- | --- |
| Deadline to serve Assumption Notice | September 19, 2018 |
| Deadline to object to Sale | September 20, 2018 |
| Auction Date | 9:00 a.m. PT, September 21, 2018 |
| Sale Hearing | September 24, 2018 |
| Closing Deadline | September 25, 2018 |

23.     Playhut respectfully submits that the timeline set forth in the Bidding Procedures is reasonable and necessary under the circumstances and industry deadlines the Playhut is confronted with. This period will allow parties in interest sufficient time to formulate bids for the Assets. Moreover, relevant information regarding the Assets will be made available during Playhut's marketing process, allowing potential bidders to conduct due diligence. Bidders will be provided with immediate access to the information regarding Playhut's Assets, subject to the execution of an appropriate confidentiality agreement as described in the Bidding Procedures and herein.

24.     Playhut's CRO, in the exercise of his business judgment and in consultation with Playhut's legal advisor, will be authorized and directed to make all decisions for Playhut, and to take all necessary and appropriate actions, to implement the Bidding Procedures and the sale of Playhut's Assets. As noted above, Mr. Zheng has been invited to participate in the process as a potential bidder or plan proponent, or to the extent that Mr. Zheng waives his right to so participate, then he will participate in the process as a Consultation Party.

**D.     Notice Procedures for the Sale, Bidding Procedures, Auction, and Sale Hearing**

24.     Playhut also requests approval of the sale notice (the "**Sale Notice**"), substantially in the form attached to the Bidding Procedures Order as Exhibit 3.

25.     Playhut will serve the Sale Notice by email, mail, or facsimile within two (2) business days of entry of the Bidding Procedures Order upon: (1) the Office of the United States Trustee for the Central District of California; (2) counsel to Preferred Bank; (3) all parties known by Playhut to assert a lien on any of the Assets; (4) all persons known or reasonably believed to have expressed an

19

interest in acquiring all or a substantial portion of the Assets since the Petition Date; (5) all of Playhut's other known creditors and equity security holders, including the Counterparties; and (6) all other parties that had filed a notice of appearance and demand for service of papers in this chapter 11 case as of the service date (collectively, the "**Sale Notice Parties**").

26.    Playhut will post the Sale Notice and the Bidding Procedures Order on the Court's website in accordance with the Local Rules for the Bankruptcy Court for the Central District of California.

**E.    Assumption and Assignment Procedures**

27.    To facilitate the Sale, Playhut seeks authority to assume and assign to the Successful Bidder(s) any of the Contracts selected by the Successful Bidder in accordance with the Assumption and Assignment Procedures.

28.    The Assumption and Assignment Procedures are as follows:

**(a)**    On or before September 18, 2018 (the "**Assumption Notice Deadline**"), Playhut shall file with the Court and serve on each counterparty (each, a "Counterparty," and collectively, the "**Counterparties**") to a Contract a notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "**Assumption Notice**").

**(b)**    The Assumption Notice shall include, without limitation, the cure amount (each, a "**Cure Amount**"), if any, that Playhut believes is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Contracts.

**(c)**    If after the Assumption Notice Deadline additional executory contracts or unexpired leases of Playhut are determined to be Contracts (such additional contracts, the "**Additional Contracts**"), as soon as practicable thereafter and in no event less than one (1) business day before the commencement of the Auction, Playhut shall file with the Court and serve, by overnight delivery, on the affected Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections (as defined below) not later two (2) hours prior to the commencement of the Sale Hearing.

**(d)**    As soon as reasonably practicable after the conclusion of the Auction, Playhut shall file with the Court a notice identifying the Successful Bidder (a "**Notice of Successful Bidder**"), which shall set forth, among other things, (i) the Successful Bidder and Back-Up Bidder (if any), (ii) the Selected Contracts (as defined below), (iii) the proposed assignee(s) of such Selected Contracts, and (iv) contact information of the proposed assignee, so that Counterparties to the Selected Contracts may obtain the Successful Bidder's Adequate Assurance Information (as defined below), which shall be provided to each affected Counterparty on a confidential basis.

20

**(e)**    No later than one (1) business day after conclusion of the Auction, Playhut will cause to be served by overnight mail the Notice of Successful Bidder upon each affected Counterparty and all parties requesting notice under Bankruptcy Rule 2002.

**(f)**    If a Counterparty objects to (i) the Cure Amount for its Contract or (ii) Playhut's ability to assume and assign the Contract, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined below) a written objection (a "**Contract Objection**"). Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of this Court together with proof of service, **on or before September 20, 2018** (the "*Contract Objection Deadline*"); (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon Playhut and the Consultation Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

**(g)**    If a Counterparty objects to the provision of adequate assurance of future performance by a Successful Bidder, such objection may be asserted after the Successful Bidder is designated in accordance with the Bid Procedures.  For the avoidance of doubt, all adequate assurance objections shall be filed not later than two (2) hours prior to the commencement of the Sale Hearing.

**(h)**    At the Sale Hearing, Playhut will seek Court approval of the assumption and assignment to any Successful Bidder of only those Contracts that have been selected by any Successful Bidder to be assumed and assigned (each, a "**Selected Contract**," and collectively, the "**Selected Contracts**"). Playhut and its estate reserve any and all rights with respect to any Contracts that are not ultimately selected as Selected Contracts.

**(i)**    If no Contract Objection is timely received with respect to a Selected Contract: (i) the Counterparty to such Selected Contract shall be deemed to have consented to the assumption by Playhut and assignment to the Successful Bidder of the Selected Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Selected Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Contract shall be controlling, notwithstanding anything to the contrary in such Selected Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Contract against Playhut and its estate or any Successful Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

21

**(j)**  To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "**Cure Dispute**"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by Playhut and the Successful Bidder or fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Contract may be assumed by Playhut and assigned to any Successful Bidder, provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by Playhut or the Successful Bidder, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

**(k)**  Notwithstanding anything to the contrary herein, if after the Sale Hearing or the entry of the Sale Order additional executory contracts or unexpired leases of Playhut are determined to be Contracts, as soon as practicable thereafter, Playhut shall file with the Court and serve, by overnight delivery, on the Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections not later than fourteen (14) days thereafter. If no Contract Objection is timely received, Playhut shall be authorized to assume and assign such Contracts to any Successful Bidder, without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

## BASIS FOR RELIEF

### A. Sufficient Business Justification Exists for Consummation of the Sale Under Sections 105(a) and 363(b) of the Bankruptcy Code

29.    Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir.

22

1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.*); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in Abbotts Dairies); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

30.    In the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is in the best interest of the estate, and a business justification exists for authorizing the sale. *In re Huntington, Ltd.*, 654 F.2d 578 (9th Cir. 1981); *In re Walter*, 83 B.R. 14, 19-20 (9th Cir. B.A.P. 1988). The Ninth Circuit has also held that section 363 allows the sale of substantially all assets of a debtor's bankruptcy estate after notice and a hearing. *In re Qintex Entertainment, Inc.*, 950 F.2d 1492 (9th Cir. 1991).

31.    The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

32.    In determining whether a sale satisfies the business judgment standard, courts have held that: (a) there be a sound business reason for the sale; (b) accurate and reasonable notice of the sale be given to interested persons; (c) the sale yield an adequate price (i.e., one that is fair and reasonable); and (d) the parties to the sale have acted in good faith. *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *see also, In re Walter*, 83 B.R. at 19-20. Playhut submits that their proposed sale clearly comports with each of these four criteria and demonstrates that Playhuts' business judgment to proceed with the proposed sale is sound.

**(a)    Sound Business Purpose.**

23

33.     There must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy court may order such disposition under Section 363(b). *In re Lionel Corp.*, 722 F.2d at 1070. The Ninth Circuit Bankruptcy Appellate Panel in *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under Section 363(b). In *Walter*, the Bankruptcy Appellate Panel, adopting the reasoning of the Fifth Circuit in *In re Continental Airlines, Inc.*, 780 F.2d 1223 (5th Cir. 1986) and the Second Circuit in *In re Lionel Corp.*, *supra*, articulated the standard to be applied under Section 363(b) as follows:

> Whether the proffered business justification is sufficient depends on the case. As the Second Circuit held in *Lionel*, the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the Debtor, creditors and equity holders, alike. He might, for example, look to such relevant facts as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*In Re Walter*, 83 B.R. at 19-20, citing *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986).

34.     The facts pertaining to Playhut's proposed sale clearly substantiate Playhut's business decision that such contemplated sale serves the best interests of its estate, its creditors and shareholders and merits the approval of the Court.  Playhut and the Committee, in consultation with Preferred Bank, agree that an immediate sale of all or substantially all of Playhut's assets is the best path forward as it will maximize the value of the estate for the benefit of all creditors. A sale of its assets under section 363(f) through a market-tested process will provide an opportunity to de-lever the financial burdens on Playhut's business imposed by its existing debt-load and legacy debts, as well as shed certain non-essential surplus inventory.  Further, Preferred Bank has considerable concern about a deteriorating collateral position, and as such, has only extended the use of cash

24

collateral through September 20, 2018. Playhut therefore submits that its proposed asset sale is justified by sound business purposes, satisfying the first requirement for a sale under Section 363(b) of the Bankruptcy Code.

### (b)    Accurate and Reasonable Notice.

*35.*    In connection with a proposed sale under Section 363 of the Bankruptcy Code, "four pieces of information must be presented to the creditors. The notice should: place all parties on notice that the debtor is selling its business; disclose accurately the full terms of the sale; explain the effect of the sale as terminating the debtor's ability to continue in business; and explain why the proposed price is reasonable and why the sale is in the best interest of the estate." *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 180 (D. Del. 1991). A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections. *In re Karpe*, 84 B.R. 926, 930 (Bankr. M.D. Pa. 1988). The purpose of the notice is to provide an opportunity for objections and hearing before the court if there are objections. *Id.*

36.    Playhut submits that the proposed notice satisfies the requirements of Bankruptcy Rules 6004(a) and (c), which provide as follows:

> "(a) ... Notice of a proposed ... sale ... of property ... not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2),(c)(1),(i) and (k) ...(c) ... A motion for authority to sell property free and clear of liens or other interests shall be made in accordance with Rule 9014 and shall be served on the parties who have liens or other interests in the property to be sold. The notice required by subdivision (a) of this rule shall include the date of the hearing on the motion and the time within which objections may be filed and served on the debtor in possession..."

Fed. R. Bankr. P. 6004(a)(c).

### (c)    Fair and Reasonable Price.

37.    In order to be approved under Section 363(b) of the Bankruptcy Code, the purchase price must be fair and reasonable. *Coastal Indus., Inc. v. U.S. Internal Revenue Service* (*In re Coastal Indus., Inc.*), 63 B.R. 361, 368 (Bankr. N.D. Ohio 1986). Several courts have held that "fair value" is given for property in a bankruptcy sale when at least 75% of the appraised value of such property is paid. *See In re Karpe*, 84 B.R. at 933; *In re Abbotts Dairies of Pennsylvania, Inc.*, 788

F.2d 143, 149 (3d Cir. 1986); *Willemain v. Kivitz*, 764 F.2d 1019 (4th Cir. 1985); *In re Snyder*, 74 B.R. 872, 878 (Bankr. E.D. Pa. 1987); *In re The Seychelles, Partnership and Genius  Corp. v. Banyan Corp.*, 32 B.R. 708 (N.D. Tex. 1983). However, Playhut also realize that "[its] main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold." *In re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), *all' d*, 147 B.R. 650 (S.D.N.Y. 1992). "It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988); *see also In re Wilde Horse Enterprises*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991) ("In any sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold").  The marketing and sale process undertaken and proposed by Playhut and its CRO was designed to insure that the highest price possible is obtained for the Assets. The post-petition overbid marketing process that Playhut is undertaking in accordance with the Bidding Procedures Order will insure that under the circumstances the highest and best price is paid for the Assets and that purchase price will necessarily will be equal to the current fair market value of the Purchased Assets.

### (d) **Fair and Reasonable Price.**

38.     When a bankruptcy court authorizes a sale of assets pursuant to Section 363(b)(1), it is required to make a finding with respect to the "good faith" of Purchaser. *In re Abbotts Dairies*, 788 F.2d at 149. Such a procedure ensures that Section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11, and as such, it mirrors the requirement of Section 1129, that the Bankruptcy Court independently scrutinizes the debtor's reorganization plan and makes a finding that it has been proposed in good faith. *Id.* at 150.

39.     "Good faith" encompasses fair value, and further speaks to the integrity of the transaction. *In re Wilde Horse Enterprises*, 136 B.R. at 842. With respect to the debtor's conduct in conjunction with the sale, the good faith requirement "focuses principally on the element of special

ACTIVE\64185774.v3-9/12/18

treatment of the Debtor's insiders in the sale transaction." *See In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987). With respect to the buyer's conduct, this Court should consider whether there is any evidence of "fraud, collusion between the purchaser and other bidders or the [debtor], or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies*, 788 F.2d at 147; *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Wilde Horse Enterprises*, 136 B.R. at 842; *In re Alpha Industries, Inc.*, 84 B.R. 703, 706 (Bankr. D. Mont. 1988). In short, "[1]ack of good faith is generally determined by fraudulent conduct during the sale proceedings." *In re Apex Oil Co.*, 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988), citing *In re Exennium, Inc.*, 715 F.2d 1401, 1404-05 (9th Cir. 1983). *See also In re M Capital Corp.*, 290 B.R. 743 (B.A.P. 9th Circuit, 2003).

40.    In In re Filtercorp, Inc., 163 F.3d 570 (9th Cir. 1998), the Ninth Circuit set forth the following test for determining whether a buyer is a good faith purchaser:

A good faith buyer "is one who buys 'in good faith' and 'for value.' [citations omitted.] [L]ack of good faith is [typically] shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.' [citations omitted.]

*Filtercorp*, 163 F.3d at 577.

The Ninth Circuit made clear in Filtercorp that this standard for determining good faith is applicable even when the buyer is an insider.

41.    Mr. Zheng has been invited to submit a bid for the Assets but has not yet indicated whether he will do so. With the exception of Mr. Zheng, Playhut is not aware of any insider who is contemplating being a potential overbidder. Playhut is not aware of any fraud, collusion or attempt to take unfair advantage of other bidders. Based on the foregoing, and subject to a satisfactory declaration being submitted by Purchaser describing its relationship with Playhut, if any, as well as its good-faith conduct throughout the sale process, Playhut submits that the Court should find that Purchaser (or a successful overbidder) constitutes a good faith purchaser entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

27

ACTIVE\64185774.v3-9/12/18

42.     Playhut's decision to pursue a sale of the Assets represents a reasonable exercise of Playhut's business judgment, and, accordingly, Playhut should be authorized to sell the Assets, subject to the outcome of the auction process described herein, under sections 105(a) and 363(b) of the Bankruptcy Code. Playhut believes that the optimal result for all stakeholders will be reached by preserving its business and Assets as a going concern. Playhut is conducting an extensive process to market the Assets. The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Playhut's estate receives the highest or otherwise best value available for the Assets by allowing the market to determine the purchase price of the Assets and, Playhut believes, will provide a greater recovery than would be provided by any other available alternative. Moreover, Playhut and its advisors are committed to entertaining and pursuing all value-maximizing alternatives and, accordingly, will be soliciting interest for both sales of the Assets or alternative restructuring proposals to ensure that they derive the highest or otherwise best value for the Assets. Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Stalking Horse Purchaser or other Successful Bidder, and establish that Playhut and such bidder have proceeded in good faith.

43.     Additionally, Playhut believes that the notice procedures described above are reasonable and adequate under the circumstances. Bankruptcy Rules 2002(a) and (c) require Playhut to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections. Playhut believes that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of any Stalking Horse Agreement, the Sale, Bidding Procedures, Auction, and Sale Hearing to Playhut's creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the Assets.

44.     Accordingly, the proposed Sale is the best path forward for maximizing recoveries to Playhut's estate, its creditors, and all parties in interest, given both the open nature of the proposed process and the need for a Sale to occur given Playhut's current financial circumstances as outlined in the *Declaration of Yu "Brian" Zheng*, filed on May 24, 2018 as D.I. 2 (the "First Day

28

Declaration"). Playhut submits that ample business justification exists for the consummation of Sale and, therefore, requests that the Court approve such Sale.

**B.    The Sale of the Assets Free and Clear of All Encumbrances Is Authorized Under Section 363(f) of the Bankruptcy Code**

78.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell assets free and clear of liens. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

46.    Playhut submit that, to attract the highest or otherwise best value for creditors, it is appropriate to sell its Assets on a final "as is" basis, free and clear of any and all Encumbrances (except as otherwise expressly set forth in the Sale Order and a Stalking Horse Agreement or a Purchase Agreement with a Successful Bidder, as applicable) in accordance with section 363(f) of

ACTIVE\64185774.v3-9/12/18

the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to such Sale.

47.    In particular, Playhut believes that it will meet section 363(f)(2) of the Bankruptcy Code with respect to Playhut's prepetition secured lender that has a first-lien position on any of the Assets because Playhut's prepetition secured lender will consent to the Sale. In fact, Preferred Bank, who has a first lien position on Playhut's personal property, is requiring a sale process as a condition to its consent to the use of its cash collateral.  Preferred Bank is likely under secured and there is no collateral value for any junior creditor. Moreover, with respect to any other party asserting a lien, claim, or encumbrance against the Assets, Playhut anticipates that it will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code. In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested. Such lienholders that do not object to the Sale should be deemed to have consented. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same). Consistent with the foregoing, the Bidding Procedures Order provides that the absence of a timely objection to the sale of the Assets in accordance therewith shall be "consent" to such sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

48.    To the extent that any lenders do not consent to the Sale, Playhut will demonstrate that such sale is appropriate under either or both of sections 363(f)(3) and (5) of the Bankruptcy Code. *See, e.g., In Re Boston Generating, LLC*, 440 B.R. 302 (Bankr. S.D.N.Y. 2010).

49.    Section 363(f)(5) of the bankruptcy code permits a sale of property free and clear of liens and interests if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5).

ACTIVE\64185774.v3-9/12/18

50.     Pursuant to 11 U.S.C. §363(f)(5), a trustee may sell property free and clear of any interest if the holder of that interest "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5); *P.K.R. Convalescent Centers, Inc. v. Commonwealth of Virginia, Dep't of Medical Assistance Serv.* (*In re P.K.R. Convalescent Centers, Inc.*), 189 B.R. 90 (Bankr. E.D. Va. 1995) (allowing sale of nursing home assets under section 363(f)(5) over objection of the Department of Medical Assistance Service where its interest was reducible to a claim and subject to a hypothetical money satisfaction).

51.     Section 363(f)(5) has generally been interpreted to mean that if, under applicable law, the holder of the lien or interest could be compelled to accept payment in exchange for its interest, the trustee (or debtor-in-possession) may take advantage of that right by replacing the holder's lien or interest with a payment or other adequate protection.  Collier on Bankruptcy, ¶ 363.06 [6] (15th ed. rev. 2003) ("Collier"). Applicable nonbankruptcy law may recognize a monetary satisfaction when the lien holder is to be paid in full out of the proceeds of the sale or otherwise. *Id.* Thus, for example, a sale free of a first mortgage might be approved when the proceeds are sufficient to pay in full the first mortgage and the second mortgagee has consented to the sale.

52.     Furthermore, Playhut proposes that any Encumbrances asserted against the Assets be transferred to and attach to the proceeds of such Sale.

53.     However, section 363(f)(5) does not require full payment to the lien or interest holder if the trustee can demonstrate the existence of another legal or equitable proceeding by which the holder may be compelled to accept less than full satisfaction of the secured debt.  *In re Grand Slam U.S.A., Inc.*, 178 B.R. 460, 461-62 (E.D. Mich. 1995) (holding that the "money satisfaction" language in section 363(f)(5) does not require full payment to the lien holder); *In re  Healthco Int'l Inc.*, 174 B.R. 174, 176-78 (Bankr. D. Mass. 1994) (construing "money satisfaction of such interest" to mean a payment constituting less than full payment of the underlying debt because any lien can always be discharged by full payment of the underlying debt pursuant to section 363(f)(3)); *Scherer v. Federal National Mortgage Association (In re  Terrace Chalet Apartments, Ltd.)*, 159 B.R. 821, 829 (Bankr. N.D. Ill. 1993).

ACTIVE\64185774.v3-9/12/18

54.     Courts have held that chapter 11 cramdown is a typical "legal proceeding" by which an entity may be compelled to accept less than full money satisfaction and which will permit the sale of creditor's collateral free and clear of interest under section 363(f)(5).  *In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002)(holding that the liens or interests identified in the sale motion could be compelled to accept a money satisfaction in a cram down plan of reorganization in a chapter 11 case); *Scherer v. Federal National Mortgage Association* (*In re Terrace Chalet Apartments, LTD.*), 159 B.R. at 829 (finding that section 1129(b)(2) cram down is such a provision); *In re Perroncello*, 170 B.R. 189 (Bankr. D. Mass. 1994); Collier ¶ 363.06[6][a]. Thus, the trustee can sell property free and clear of a creditor's lien it if demonstrates it can cram down the creditor's interest pursuant to § 1129(b)(2).

55.     Likewise, the holder of a tax lien that would be subordinated under section 724 can be compelled to accept less than full payment. *In re Grand Slam U.S.A.*, Inc., 178 B.R. at 461-62 (holding that § 724(b)(2) is applicable for purposes of § 363(f)(5) because it creates a mechanism by which lien creditors are compelled to receive less than full payment of their interest); *In re Healthco Int'l Inc.*, 174 B.R. 174, 176-78 (Bankr. D. Mass. 1994)(concluding that a trustee may sell property pursuant to section 363(f)(5) free of the county's tax lien lien); Collier, ¶ 363.06[6] [a].

56.     In addition to the legal arguments set forth above, the ability of a debtor to "cram-down" a secured creditor under 11 U.S.C. Sec. 1129(b)(1) and (2) also constitutes a "legal proceeding" pursuant to which a secured creditor could be compelled to accept a money satisfaction. *See In re Grand Slam, U.S.A. Inc.*, 178 B.R. 460, 462 (E.D. Mich. 1995); 11 U.S.C. Sec.1129(b)(2)(A).

57.     Section 1129(b)(2)(A) allows cram-down of a secured creditor, provided that it receives "the indubitable equivalent" of its claim. A debtor can cram down a secured creditor if it demonstrates (1) the debtor is not unfairly discriminating against the secured creditor, 11 U.S.C. § 1129(b)(1); (2) it is acting in good faith, 11 U.S.C. § 1129(a)(3)-(b)(1); and (3) the secured creditor is receiving the actual value of its claim. 11 U.S.C. § 1129(b)(2)(A)(i)(II), 11 U.S.C. §

1129(b)(2)(A)(iii), *see also In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1350 (5th Cir.1989) (holding that "indubitable equivalent" of a secured creditor's interest is the actual value of the claim).

58.    In *In re Hunt Energy Co., Inc.*, 48 B.R. 472, 485 (Bankr. N.D. Ohio, 1985), the court found that a lien which attaches to the proceeds of a sale would necessarily be reduced by subsequent valuation at a hearing under section 506(a) to meet the "indubitable equivalence" requirements of section 1129(b)(2)(A). Once section 1129(b)(2)(A) is satisfied, the lienholder would be compelled through the cram-down process to accept such money satisfaction as dictated by the cram-down provisions. *Id.*

59.    All of the above requirements for cram down are met in this case. Based upon all of the foregoing, all creditors of Playhut could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of their interest. Playhut's proposed sale should therefore be free and clear of all Liens pursuant to section 363(f)(5) of the Bankruptcy Code.

**C.    Secured Parties Should Be Authorized to Credit Bid on the Assets under Section 363(k) of the Bankruptcy Code**

60.    Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the full face value of its claim and does not limit the credit bid to the claim's economic value. *See Cohen v. KB Mezzanine Fund II, LP* (*In re Submicron Sys. Corp.*), 432 F.3d 448, 459-60 (3d Cir. 2006).

61.    As a result, Playhut proposes that any party that holds claims, that is not subject to objection by the start of the Auction, that are secured by valid, binding, enforceable, non-avoidable and perfected liens on and security interests in an Asset, be permitted to submit a credit bid for the Assets subject to those liens and security interest, subject to providing Secured Claim Documentation (as defined in the Bidding Procedures) satisfactory to Playhut.

ACTIVE\64185774.v3-9/12/18

**D.**    **The Sale Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code**

62.    Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m). In approving the Sale free and clear of Encumbrances, Playhut requests that the Court find and hold that all purchasers of Assets purchased in accordance with the Bidding Procedures are entitled to the protections afforded by section 363(m) of the Bankruptcy Code. Such relief is appropriate in that selection of the Successful Bidder will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction. *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

**E.**    **The Court Should Approve the Bidding Procedures**

63.    The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same). Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales. *See Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) ("**O'Brien**"); see also Integrated Res. Inc., 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

64.    Playhut has designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, to maximize value for Playhut's estate and creditors. The Bidding

ACTIVE\64185774.v3-9/12/18

Procedures will allow Playhut to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that Playhut will receive the highest or best possible consideration for the Assets. Furthermore, the Bidding Procedures provide an appropriate framework for Playhut to review, analyze and compare any bids received to determine which bids are in the best interests of Playhut's estate and its creditors.

65.    Finally, the timeline under the Bidding Procedures is appropriate in light of Playhut's business needs.  An immediate sale is imperative - the September 30, 2018 conference registration start date for the Toy Association's October 2-4, 2018 "Fall Toy Preview" creates urgency for buyers. Meetings with toy manufacturers for fall 2019 production programs and meetings with overseas suppliers to secure inventory production are starting now. The window in which any buyer can take over the Playhut operation and prepare for 2019 is rapidly dwindling.  Second, Preferred Bank's considerable concern about a deteriorating collateral position has caused it to extend the use of cash collateral only through September 20, 2018.  Accordingly, Playhut believes that it is critical to the value of Playhut's business, including the preservation of its customer relationships, that a committed purchaser with fresh capital be in place at the start of that season to ensure that production needs are met. Further, it is imperative that the sale close and a new purchaser be operational prior to a critical trade show occurring in October 2018.  The timeline under the Bidding Procedures accomplishes that goal. Further, the marketing process provided for prior to the Bid Deadline will benefit from the extensive outreach conducted by Playhut's CRO, and Playhut and its advisors believe that this aggregate period will be sufficient to fully canvass the market for interest in a Transaction.

66.    Playhut submits that the Bidding Procedures are fair, transparent and will derive the highest or best bids for the Assets. Therefore, Playhut and the Committee request that the Court approve the Bidding Procedures, including, without limitation, the dates established thereby for the Auction and the Sale Hearing.

**F.**    **Bidding Protections are in the Best Interests of Playhut and its Estate and Should be Authorized**

ACTIVE\64185774.v3-9/12/18

67. Bid protections, including traditional breakup fees and expense reimbursement provisions, will be approved where they are necessary for the preservation of the debtor's estate. *See, e.g., In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (citing *O'Brien*, 181 F.3d at 537); *see also Integrated Res.*, 147 B.R. at 659 (bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets"). In *O'Brien*, the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must benefit a debtor's estate. *O'Brien*, 181 F.3d at 533.

68. The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, benefit may be found if "assurance of break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id*.

69. In *O'Brien*, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a breakup fee or expense reimbursement: (1) the presence of self-dealing or manipulation in negotiating the breakup fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the breakup fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction;" (5) the ability of the request for a breakup fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;" (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors' committees of breakup fee; (8) the benefits

36

of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the breakup fee] on unsecured creditors, where such creditors are in opposition to the breakup fee." *Id.* at 536.

70.    The Court should not "cherry-pick" among contractual provisions, objecting to select individual portions, if the agreement as a whole is supported by an articulated business judgment. At least one bankruptcy court has expressly applied this corollary to a transaction including breakup and overbid provisions in the sale of the debtor's business. In *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y. 1990), the Court approved a transaction including provisions relating to a breakup fee and minimum overbids. In responding to objections to other provisions of the agreement, the Court held that:

> The Court is not to second guess the inclusion of some provisions as long as the Agreement as a whole is within reasonable business judgment, and the subject provisions do not distort the balance Congress struck in Chapter 11. *Cf. In re Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al.*, 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) (some contractual provisions may be justified by the need to attract a prospective investor.).

114 B.R. at 886.

71.    In regards to break-up fees, in general, "[a] 'break-up fee' is an incentive payment to an unsuccessful bidder who placed the estate property in a sales configuration mode ... to attract other bidders to the auction." *In re Financial News Network, Inc.*, 126 B.R. 152, 154 n. 5 (Bankr. S.D.N.Y. 1991); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 653 (S.D.N.Y. 1992), *app. dismissed on jurisdictional grounds*, 3 F.3d 49 (2d Cir. 1993) ("[a] break-up fee, or more appropriately, a termination fee, is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction"). Agreements to provide breakup fees are designed to compensate the potential acquirer who serves as a catalyst or "stalking horse" which attracts more favorable offers. *In re S.N.A. Nut Co.*, 186 B.R. 98, 101 (Bankr. N.D.Ill. 1995); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

72.    Outside of bankruptcy, a break-up fee is generally allowed as long as it "enhances" the bidding. *In re S.N.A. Nut Co.*, 186 B.R. at 102. In the bankruptcy context, a break-up fee is generally permissible "if reasonably related to the bidder's efforts and the transaction's magnitude." *Cottle v. Storer Communication Inc.*, 849 F.2d 570, 578 (11th Cir. 1988); *In re 995 Fifth Ave.*, 96

37

B.R. at 28. Generally speaking, whether the payment of a break-up fee is appropriate is evaluated under the "business judgment rule." *In re S.N.A. Nut Co.*, 186 B.R. at 102. Under this rule, there is a presumption that, in making a business decision, debtor acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the estate. Therefore, bidding procedures proposed to be utilized by a debtor with respect to a proposed sale should be approved when the Court determines that such procedures are fair and do not violate any of the debtor's fiduciary duties. *Id.*

73.     In evaluating the appropriateness of a break-up fee, the appropriate question for the Court to consider is "whether the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." *In re Integrated Resources, Inc.*, 147 B.R. at 662. The published opinions addressing break-up fees provide for a broad range of break-up fees, typically in the range of 1-5% of the purchase price. *See In re Twenver, Inc.*, 149 B.R. 954, 957 (Bankr. D. Colorado 1992) (stating that breakup fees of 1% to 2% are found to be reasonable in the majority of cases approving such fees); *In re Integrated Resources, Inc.*, 147 B.R. 650, 662 (Bank. S.D.N.Y. 1992) (where the Court heard testimony that the average breakup fee in the industry is 3.3%); *Cottle v. Storer Communication, Inc.*, 849 F.2d 570 (11th Cir. 1988) ($18 million termination fee approved using business judgment rule where fee was 1.16% of sale price); *Samjens Partners I v. Burlington Indus.*, 663 F.Supp. 614 (S.D.N.Y. 1987) (breakup fee calculated as 2% of the value of the company was "not so onerous as to end the auction); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving $500,000 break-up fee in a $45 million sale – 1.11%); and *Beebe v. Pacific Realty Trust*, 578 F.Supp. 1128 (D. Or. 1984) (termination fee calculated as 1% of the transaction was reasonable). Notwithstanding the foregoing, Break-up fees of over three percent have been routinely approved in the context of bankruptcy sales. *See In re CXM, Inc.*, 307 B.R. 94, 103–04 (Bankr. N.D. Ill. 2004) (Court approved break-up fee in amount equal to the actual expenses that the stalking horse incurred in connection with its bid to buy the Sale Assets, subject to a maximum cap of $200,000, which equaled 3% of the cash purchase price of $5,914,000*); In re*

38

*Women First Healthcare, Inc.*, 332 B.R. 115, 118, (Bankr. D. Delaware 2005) (Court approved break-up fee and expense reimbursement that equaled 4.7% percent of the purchase price; *In re Dan River, Inc.*, No. 04-10990 (Banker.N.D.Ga. December 17, 2004) (Court approved break-up fee equal to 5.3% of the cash purchase price); and *In re Lake Burton Development, LLC*, No. 09-22830 (Bankr.N.D.Ga. April 1, 2010) (Court approved break-up fee equal to 4.75% of cash purchase price).

74.    Playhut submits that all of the bidding procedures it is seeking to have the Court approve, including the proposed break-up fee, satisfies all three of the useful functions prescribed by the *Integrated Resources* case (i.e., (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; and (3) to attract additional bidders). The proposed break-up fee not to exceed three percent (3.0%) of the aggregate cash purchase price is well within the percentage parameters that have been approved by many other courts. It would not have been possible for the Debtors to obtain a stalking horse bidder with a purchase price in this range without the payment of a comparable break-up fee.

75.    Playhut believes that putting in place a Stalking Horse Purchaser for the Assets will achieve maximum value in its proposed Sale process and, to that end, Playhut and its advisors intend to solicit interest in the market for parties to serve as Stalking Horse Purchaser. Playhut believes that if it identifies a viable Stalking Horse Purchaser, it may need to offer that party Bid Protections. Playhut seeks authority to negotiate a Break-Up Fee of up to 3.0%, an amount that Playhut believes is reasonable in this type of transaction and within the range of other court-approved break-up fees. *See, e.g., In re Filene's Basement, LLC*, Case No. 11-13511 (KJC) (Bankr. D. Del. Apr. 9, 2012) (Court approved breakup fee of 3%); *In re Magic Brands, LLC*, Case No. 10-11310 (BLS) (Bankr. D. Del. Apr. 22, 2010) (Court approved breakup fee and reimbursement expense equal to 3.5% of cash portion of purchase price); *In re Chi-Chi's, Inc.*, Case No. 03-13063 (Bankr. D. Del. Nov. 4, 2003) (fee of 5.1% permitted). Further, payment of the Bid Protections would not diminish Playhut's estate, as Playhut would not incur the obligation to pay the Break-Up Fee unless a higher and better bid is accepted and such transaction closes. Absent authorization of the Bidding Protections, Playhut

ACTIVE\64185774.v3-9/12/18

could lose a potential Stalking Horse Purchaser and thus may lose the opportunity to obtain the highest and best offer for the Assets.

76.    Ultimately, Playhut intends to establish the factual predicates for the Bidding Protections and satisfy the standards adopted for bidding protections at the initial hearing on the Motion. However, if no Stalking Horse Purchaser is selected by then, either (i) subject to the parameters described herein, which Playhut submits are reasonable and appropriate, and with the consent of the Consultation Parties or (ii) to the satisfaction of the Court if Playhut notices the designation for a hearing.

## G.    The Assumption and Assignment of the Contracts in Connection with the Sale Satisfies Section 365 of the Bankruptcy Code

77.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a); *In re Klein Sleep Products, Inc.*, 78 F.3d 18, 25 (2d. Cir. 1996); *In re Central Fla. Metal Fabrication, Inc.*, 190 B.R. 119, 124 (Bankr. N.D. Fla. 1995); In re Gucci, 193 B.R. 411, 415 (S.D.N.Y. 1996).  One Circuit Court has stated that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

78.    The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard. *See In re Continental Country Club, Inc.*, 114 B.R. 763, 767 (Bankr. M.D. Fla. 1990); *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); *In re Prime Motors Inns*, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991), citing *Lubrizol Enterprises v. Richmond Metal  Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985), cert.

40

denied, 475 U.S. 1057 (1986) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice). As described above, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'" *Integrated Res., Inc.*, 147 B.R. at 656 (S.D.N.Y 1992) (quoting Smith v. Van Gorkom, 488 A.2d at 872).

79.    The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See id.; see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."). Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease. *See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate."); *see also N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42-43 (2d Cir. 1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

80.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign its executory contracts and unexpired leases, provided the debtor first assumes such executory contracts and unexpired leases in accordance with section 365(b)(1), and provides adequate assurance of future performance by the assignee. Pursuant to section 365(b)(1), assumption of executory contracts and unexpired leases requires a debtor to: (a) cure any existing defaults under such agreements; (b) compensate all non-debtor parties to such agreements for any actual pecuniary loss resulting from the defaults; and (c) provide adequate assurance of future performance under the contract or lease. 11 U.S.C. § 365(b)(1); *see also In re Bowman*, 194 B.R. 227, 230 (Bankr. D. Ariz. 1995); *In re AEG*

41

*Acquisition Corp.*, 127 B.R. 34, 44 (Bankr. C.D. Cal. 1991), *aff'd* 161 B.R. 50 (9th Cir. B.A.P. 1993). Pursuant to section 365(f)(1) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease pursuant to section 365(f)(2) of the Bankruptcy Code notwithstanding any provision in such executory contract or unexpired lease that prohibits, restricts or conditions the assignment of such executory contract or unexpired lease.

81.    The assumption and assignment of executory contracts furthers the goals of Chapter 11 of promoting reorganization by balancing the debtor's interest in maximizing the value of its estate against the contracting party's interest in receiving the benefit of its bargain and being protected against default by the debtor after assumption has occurred.  *In re Embers 86th Street. Inc*., 184 B.R. 892, 896 (Bankr. S.D.N.Y. 1995).

82.    Here, Playhut has exercised its sound business judgment in determining that assumption and assignment of any Contracts in connection with the Sale is in the best interests of Playhut and its estate, and, accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code. *See, e.g., In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 182-83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

83.    As set forth above, the Sale will yield the maximum value for Playhut's estate. To that end, the assumption, assignment and sale of any Contracts will be necessary for Playhut to obtain the benefits of any Purchase Agreement. In addition, under section 365(k) of the Bankruptcy Code, a debtor's assignment of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. §

365(k). Thus, following an assignment to the Successful Bidder of any Contract, Playhut will be relieved from any liability for any subsequent breach associated therewith.

84.    Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under any Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. 11 U.S.C. § 365(b)(1). Playhut proposes to file with the Court, and serve on each Counterparty to a Contract, an Assumption Notice that indicates the proposed Cure Amount for each such contract. As such, each Counterparty will have the opportunity to object to the proposed assumption and assignment to the Successful Bidder and to the proposed Cure Amount, if applicable. Moreover, the payment or reserve of the applicable Cure Amount, as provided for in the Bidding Procedures, will be a condition to Playhut's assumption and assignment of any Contract.

85.    Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2). The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption. *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); see also *In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985)* (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

86.    Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a

43

87.      Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Contract. For its bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "**Adequate Assurance Information**"), including: (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such potential bidder; (b) the name of the proposed counterparty that will act as the assignee of any Contract; and (c) a contact person for the proposed assignee that the Counterparty may directly contact in connection with the adequate assurance of future performance.

88.      To the extent available, the Adequate Assurance Information may also include: (x) a corporate organization chart or similar disclosure identifying ownership and control of the proposed assignee; and (y) financial statements, tax returns, and annual reports. Furthermore, given that Playhut will submit evidence at the Sale Hearing that all requirements for the assumption and assignment of such contracts have been satisfied, the Court and other interested parties will have the opportunity to evaluate the ability of each Successful Bidder to provide adequate assurance of future performance.

89.      Therefore, Playhut respectfully requests that the Court (a) approve the proposed assumption and assignment of the Contracts, and (b) find that all anti-assignment provisions of such contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[8]

---

[8] Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease..." 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f) (3). (

ACTIVE\64185774.v3-9/12/18

willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

90.     All of the applicable requirements of LBR 6004-1(b) pertaining to the Bid Procedures Motion and the request therein to approve the Bidding Procedures and Protections have been satisfied. First, as required by LBR 6004-1(b)(2), the Notice of the Bid Procedures Motion describes the proposed Bidding Procedures and Protections. Second, as required by LBR 6004-1(b)(2), the Notice of the Bid Procedures Motion and this Memorandum describe marketing efforts undertaken and the anticipated marketing of the Purchased Assets through the deadline for prospective bidders to submit bids for the Auction. Third, as required by LBR 6004-1(b)(3), the Notice of the Bid Procedures Motion, Bid Procedures Motion, and this Memorandum were served on the twenty largest unsecured creditors in the fastest manner possible under the circumstances. Therefore, the Debtors submit that service of the Notice of the Bid Procedures Motion, Bid Procedures Motion, and this Memorandum by such means was adequate and appropriate.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)

91.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

92.     As set forth throughout this Motion, any delay in Playhut's ability to consummate the Sale—should Playhut determine it is the best or only viable disposition of the Assets—would be detrimental to Playhut, its creditors and estate, and would impair Playhut's ability to maximize value in the Assets through an expeditious closing of the Sale.

93.     For this reason and those set forth above, Playhut submits that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) and 6006(d), to the extent applicable.

45

## NOTICE

94.    Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the Central District of California; (2) counsel to Preferred Bank; (3) all parties known by Playhut to assert a lien on any of the Assets; (4) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets in Playhut since the Petition Date; (5) all of Playhut's other known creditors and equity security holders, including the Counterparties; and (6) all other parties that had filed a notice of appearance and demand for service of papers in this chapter 11 case as of the service date  (the "**Motion Notice Parties**"). In light of the nature of the relief requested herein, Playhut submits that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, Playhut and Committee request entry of the Bidding Procedures Order and the Sale Order, granting the relief requested herein and such other and further relief as is just and proper.

Respectfully submitted by,

Dated:  September 13, 2018

**GOE & FORSYTHE, LLP**

**By:**  */s/ Robert P. Goe*
　　　　Robert P. Goe
　　　*Attorneys for Playhut, Inc.*


**FOX ROTHSCHILD LLP**

**By:**  */s/ Mette H. Kurth*
　　　　Mette H. Kurth
　　　*Counsel for the Official Committee of Unsecured Creditors*

46

ACTIVE\64185774.v3-9/12/18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **EXHIBIT A**

**Bidding Procedures Order**

<table>
<tr><td>

Robert P. Goe – SBN 137019
Stephen P. Reider – SBN 287820
GOE & FORSYTHE, LLP
18101 Von Karman Ave., Ste. 510
Irvine, CA 92612
Email: rgoe@goeforlaw.com
sreider@goeforlaw.com
Telephone: (949) 798-2460
Facsimile: (949) 955-9437

*Attorneys for Playhut, Inc.*

</td><td>

Rom Bar-Nissim (CA 293356)
FOX ROTHSCHILD LLP
10250 Constellation Place Ste. 900
Los Angeles, CA 90067-1506
Tel: 310-598-4150
Fax: 310-556-9828
Email: rbar-nissim@foxrothschild.com

Mette H. Kurth (CA 187100/DE 6491)
FOX ROTHSCHILD LLP
919 North Market Street, Ste. 300
Wilmington, DE 19899-2323
Tel: 302-654-7444
Fax: 302-656-8920
mkurth@foxrothschild.com

*Counsel for the Official Committee of Unsecured
Creditors*

</td></tr>
</table>

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION**

In re:

PLAYHUT, INC.,

            Debtor and Debtor-in-
Possession.

Case No. 2:18-bk-15972-WB

Chapter 11

**ORDER (I) SCHEDULING A HEARING ON THE APPROVAL OF THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (II) APPROVING CERTAIN BIDDING PROCEDURES AND ASSUMPTION AND ASSIGNMENT PROCEDURES, AND THE FORM AND MANNER OF NOTICE THEREOF, AND (III) GRANTING RELATED RELIEF**

<u>Hearing Date</u>
Date:    September 17, 2018
Time:   11:00 a.m.
Place:   Courtroom 1375, 13th floor
         255 E. Temple Street
         Los Angeles, CA 90012

ACTIVE\64234876.v1-9/12/18

Upon consideration of the motion (the "**Motion**")[1] of Playhut, Inc. (the "**Debtor**" or "**Playhut**") and the Official Committee of Unsecured Creditors of Playhut, Inc. (the "**Committee**") for the entry of an order: (a) (i) scheduling a hearing (the "**Sale Hearing**") on approval of the Sale of all or substantially all of the Debtor's Assets, or a portions thereof, free and clear of all liens, claims, Encumbrances, and other interests, and authorizing the assumption and assignment of certain Assumed Contracts in connection therewith; (ii) authorizing and approving certain bidding procedures for the Sale, attached hereto as Exhibit 1 (collectively, the "**Bidding Procedures**"), authorizing and approving certain Assumption and Assignment Procedures provided for herein, and authorizing and approving the form and manner of each of the foregoing; and (iii) granting related relief; and (b) a Sale Order (i) authorizing and approving the Debtor' entry into a Purchase Agreement or Agreements for the Assets (or a subset(s) thereof); (ii) authorizing and approving the Sale, free and clear of all Encumbrances other than those permitted by the subject Purchase Agreement; (iii) authorizing and approving the assumption and assignment of the Assumed Contacts in connection therewith; and (iv) granting related relief; and due and proper notice of the Motion having been given; and it appearing that no other or further notice of the Motion is required; and it appearing that the Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having reviewed the Motion; and upon the First Day Declaration; and this Court having found and determined that the relief sought in the Motion as to the Bidding and Auction Process (as defined below) is in the best interests of Playhut, its estate and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion, the First Day Declaration and at any hearing in connection with the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby

---

[1] Capitalized terms used but not defined herein shall have the meanings given them in the Bidding Procedures (as defined below), or to the extent not defined therein, the Motion.

ACTIVE\64234876.v1-9/12/18

### FOUND AND DETERMINED THAT:[2]

A.    This Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334.

B.    Venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

C.    The statutory and legal predicates for the relief sought herein are sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Bankruptcy Rules 6004-1 and 9013-1.

C.    The Debtor has demonstrated that good and sufficient notice of the relief granted by this Order has been given and no further notice is required. A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 2002 and all other interested parties.

D.    The Stalking Horse Notice [*is*] appropriate and reasonably calculated to provide all interested parties with timely and proper notice of: (i) the identification of the Stalking Horse Purchaser, including any affiliations with the Debtor; (ii) the Assets that are the subject of the Stalking Horse Agreement; (iii) a copy of the Stalking Horse Agreement; (iv) the purchase price provided for in the Stalking Horse Agreement; [*(v) the proposed Bid Protections*]; and (vi) the deposit paid by the Stalking Horse Purchaser. No other or further notice is required of the foregoing.

---

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

ACTIVE\64234876.v1-9/12/18

E.      *If a Stalking Horse Purchaser has been designated prior to the Bidding Procedures*

*Hearing:* With respect to the Bid Protections:

- The Debtor has demonstrated a sound business justification for the Bid Protections set forth in the Stalking Horse Agreement.

- The Bid Protections are fair and reasonable.

- The Bid Protections are: (a) an actual and necessary cost and expense of preserving the Debtor's bankruptcy estate, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtor's estate, (c) reasonable and appropriate, and (d) necessary to ensure that the Stalking Horse Purchaser would continue to pursue its proposed acquisition of the Assets.

- The Bid Protections would be a material inducement for the Stalking Horse Purchaser entering into the Stalking Horse Agreement. The Bid Protections likewise would induce the Stalking Horse Purchaser to submit a bid to purchase substantially all of the Debtor's Assets, so the Stalking Horse Purchaser has provided a benefit to the Debtor's bankruptcy estate by increasing the likelihood that the price at which the Assets are sold will reflect their true worth.]

F.      Notice of the hearing for approval of this Order and the Sale Notice (defined below) are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of this Order, the Bidding Procedures, the Auction, the Sale, and the Sale Hearing, and any and all objection deadlines related thereto, and no other or further notice is required of the foregoing.

G.      The Bidding Procedures are (i) fair, reasonable, and appropriate; and (ii) designed to maximize recovery with respect to the Assets.

H.      The Assumption and Assignment Procedures provided for herein and the Assumption Notice (as defined below) are reasonable and appropriate and consistent with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006. The Assumption and Assignment Procedures and the Assumption Notice have been tailored to provide an adequate opportunity for all Counterparties (as defined below) to assert any Contract Objections (as defined below).

I.    Entry of this Order is in the best interests of the Debtor, its estate and creditors and all other interested parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

Those portions of the Motion seeking approval of (a) the Bidding Procedures, (b) the Assumption and Assignment Procedures, (c) the date and time of the Sale Hearing, (d) the procedures regarding entry into the selection of the Stalking Horse Agreement, and (e) the noticing and objection procedures related to each of the foregoing, including, without limitation, the Stalking Horse Notice (as defined below), the notice of the Debtor's potential assumption and assignment of the Assumed Contracts, substantially in the form attached hereto as **Exhibit 2** (the "**Assumption Notice**"), and the notice of the entry of this Order, substantially in the form attached hereto as Exhibit 3 (the "**Sale Notice**") (subclauses (a) – (e) above, collectively, the "**Bidding and Auction Process**"), are hereby GRANTED to the extent set forth herein.

2.    Any objections to the Motion as it pertains to the Bidding and Auction Process or the relief granted by this Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits with prejudice.

3.    The Bidding Procedures are hereby approved. The failure to specifically include or reference any particular provision of the Bidding Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being this Court's intent that the Bidding Procedures are approved in their entirety, as if fully set forth in this Order. The Debtor is hereby authorized to conduct the Auction pursuant to the terms of the Bidding Procedures and this Order.

4.    In the event that the Debtor enters into a Stalking Horse Agreement on or prior to September 18, 2018 (the "**Stalking Horse Deadline**") the Debtor shall file with the Court and serve on Motion Notice Parties a Stalking Horse Notice. If the Stalking Horse Agreement satisfies the following conditions, (a) the Break-Up Fee does not exceed three percent (3.0%) of the aggregate cash purchase price; (b) the Expense Reimbursement does not exceed $50,000; and (c) the Consultation Parties have provided their affirmative consent to the stalking horse designation, the Debtor may submit an order under certification of counsel approving the designation of the Stalking

Horse Purchaser and Stalking Horse Agreement as a stalking horse without the need for further hearing, which order shall include findings consistent with those originally proposed in the form of order annexed to the Motion.

5.      If a Stalking Horse Purchaser has been designated prior to the Bidding Procedures Hearing: The Break-Up Fee and Expense Reimbursement set forth in the Stalking Horse Agreement are hereby authorized and approved. The Break-Up Fee and Expense Reimbursement are hereby accorded administrative expense status pursuant to sections 503(b) and 507(a)(1) of the Bankruptcy Code and shall be payable (and paid, if applicable) in accordance with the terms of the Stalking Horse Agreement.

6.      Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtor and its estate shall be authorized to provide due diligence information to Qualifying Bidders provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtor. The Debtor and its estate are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures or the Sale, provided that the information was provided in accordance with this Order.

7.      For all purposes under the Bidding Procedures: (a) any designated Stalking Horse Purchaser shall be considered a Qualifying Bidder, and any Stalking Horse Agreement shall be considered a Qualifying Bid; (b) should they decide to credit bid, applicable parties holding a perfected security interest in the Assets may seek to credit bid some or all of their claims within the meaning of section 363(k) of the Bankruptcy Code and to the extent demonstrated by their security interest documentation; provided that the applicable parties shall have the right to credit bid their claims only with respect to the collateral by which such the applicable parties are secured; and (c) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtor may consider a combination of bids for the Assets.

8.      The Bidding Procedures shall apply to the Potential Bidders, the Qualifying Bidders, the submission, receipt, and analysis of all bids relating to the Sale, and the conduct of the Sale and the Auction.

9.      The following "Assumption and Assignment Procedures" are hereby approved:

**(a)**      On or before September 18, 2018 (the "**Assumption Notice Deadline**"), Playhut shall file with the Court and serve on each counterparty (each, a "**Counterparty**," and collectively, the "**Counterparties**") to a Contract a notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "Assumption Notice").

**(b)**      The Assumption Notice shall include, without limitation, the cure amount (each, a "**Cure Amount**"), if any, that Playhut believes is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Contracts.

**(c)**      If after the Assumption Notice Deadline additional executory contracts or unexpired leases of Playhut are determined to be Contracts (such additional contracts, the "**Additional Contracts**"), as soon as practicable thereafter and in no event less than one (1) business day before the commencement of the Auction, Playhut shall file with the Court and serve, by overnight delivery, on the affected Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections (as defined below) not later two (2) hours prior to the commencement of the Sale Hearing.

**(d)**      As soon as reasonably practicable after the conclusion of the Auction, Playhut shall file with the Court a notice identifying the Successful Bidder (a "**Notice of Successful Bidder**"), which shall set forth, among other things, (i) the Successful Bidder and Back-Up Bidder (if any), (ii) the Selected Contracts (as defined below), (iii) the proposed assignee(s) of such Selected Contracts, and (iv) contact information of the proposed assignee, so that Counterparties to the Selected Contracts may obtain the Successful Bidder's Adequate Assurance Information (as defined below), which shall be provided to each affected Counterparty on a confidential basis.

**(e)**      No later than one (1) business day after conclusion of the Auction, Playhut will cause to be served by overnight mail the Notice of Successful Bidder upon each affected Counterparty and all parties requesting notice under Bankruptcy Rule 2002.

**(f)**      If a Counterparty objects to (i) the Cure Amount for its Contract or (ii) Playhut's ability to assume and assign the Contract, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined below) a written objection (a "**Contract Objection**"). Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of this Court together with proof of service, on or before September 20, 2018 (the "**Contract Objection Deadline**"); (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon Playhut and the Consultation Parties; and (v) state with specificity the grounds for such objection, including, without

limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

**(g)**     If a Counterparty objects to the provision of adequate assurance of future performance by a Successful Bidder, such objection may be asserted after the Successful Bidder is designated in accordance with the Bid Procedures.  For the avoidance of doubt, all adequate assurance objections shall be filed not later than two (2) hours prior to the commencement of the Sale Hearing.

**(h)**     At the Sale Hearing, Playhut will seek Court approval of the assumption and assignment to any Successful Bidder of only those Contracts that have been selected by any Successful Bidder to be assumed and assigned (each, a "**Selected Contract**," and collectively, the "**Selected Contracts**"). Playhut and its estate reserve any and all rights with respect to any Contracts that are not ultimately selected as Selected Contracts.

**(i)**     If no Contract Objection is timely received with respect to a Selected Contract: (i) the Counterparty to such Selected Contract shall be deemed to have consented to the assumption by Playhut and assignment to the Successful Bidder of the Selected Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Selected Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Contract shall be controlling, notwithstanding anything to the contrary in such Selected Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Contract against Playhut and its estate or any Successful Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

**(j)**     To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "Cure Dispute"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by Playhut and the Successful Bidder or fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Contract may be assumed by Playhut and assigned to any Successful Bidder, provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by Playhut or the Successful Bidder, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

**(k)**      Notwithstanding anything to the contrary herein, if after the Sale Hearing or the entry of the Sale Order additional executory contracts or unexpired leases of Playhut are determined to be Contracts, as soon as practicable thereafter, Playhut shall file with the Court and serve, by overnight delivery, on the Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections not later than fourteen (14) days thereafter. If no Contract Objection is timely received, Playhut shall be authorized to assume and assign such Contracts to any Successful Bidder, without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

10.      The Debtor' decision to assume and assign any Contract is subject to this Court's approval and the closing of the Sale.  Accordingly, absent this Court's approval and the closing of the Sale, no Contracts shall be deemed assumed or assumed and assigned, and shall in all respects be subject to further administration by the Debtor and its estate under the Bankruptcy Code in connection with these chapter 11 cases.

11.      The Assumption and Assignment Procedures are appropriate and fair to all Counterparties and comply in all respects with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules. The Assumption Notice is: (a) reasonably calculated to (i) provide sufficient, effective notice to all Counterparties and any other affected parties of the Debtor' intent to assume and assign to any Successful Bidder some or all of the Contracts and (ii) afford the Counterparties the opportunity to exercise any rights affected by the Motion and the relief granted by this Order pursuant to Bankruptcy Rules 2002(a)(2), 6004 and 6006; and (b) hereby approved.

12.      The inclusion of a contract, lease, or other agreement on an Assumption Notice shall not constitute or be deemed a determination or admission by the Debtor and its estate or any other party in interest that such contract, lease or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights of the Debtor and its estate with respect thereto shall be reserved.

13.      The Stalking Horse Notice, the Assumption Notice, the Sale Notice, the Bidding Procedures, the Auction, the Sale Hearing, and the Assumption and Assignment Procedures and the objection periods associated with each of the foregoing are reasonably calculated to provide notice to any affected party and afford the affected party the opportunity to exercise any rights affected by the Motion as it relates to the Bidding Procedures, Auction, the Sale, the Sale Hearing, and the

assumption and assignment to the Successful Bidder of the Contracts pursuant to Bankruptcy Rules 2002(a)(2), 6004 and 6006, and such notice and objection periods are hereby approved.

14.    Within two (2) business days of the entry of this Order, the Debtor shall serve the Sale Notice on: (1) the Office of the United States Trustee for the Central District of California; (2) counsel to Preferred Bank; (3) all parties known by Playhut to assert a lien on any of the Assets; (4) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets since all of Playhut's other known creditors and equity security holders, including the Counterparties; and (10) all other parties that had filed a notice of appearance and demand for service of papers in this chapter 11 case as of the service date (collectively, the "**Sale Notice Parties**").

15.    The Debtor shall post any Stalking Horse Notice, the Sale Notice and this Order on the Court's website in accordance with the Local Rules for the Bankruptcy Court for the Central District of California.

16.    Any objections to the Sale or the relief requested in connection with the Sale (a "**Sale Objection**"), other than a Contract Objection, which shall be governed by the Assumption and Assignment Procedures, must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the Clerk of this Court, together with proof of service, on or before September 20, 2018 (the "**Sale Objection Deadline**"); and (e) be served, so as to be actually received on or before the Sale Objection Deadline, upon the Debtor and the Consultation Parties. If a Sale Objection is not filed and served on or before the Sale Objection Deadline in accordance with the foregoing requirements, the objecting party shall be barred from objecting to the Sale and shall not be heard at the Sale Hearing, and this Court may enter the Sale Order without further notice to such party.

17.    Failure to file a Sale Objection on or before the Sale Objection Deadline (a) shall forever bar the assertion, whether at any Sale Hearing or thereafter, of any objection to the Motion, to entry of the Sale Order, and/or to the consummation and performance of the Sale contemplated by a Purchase Agreement with a Successful Bidder, and (b) for purposes of section 363(f)(2) of the

1   Bankruptcy Code, shall be deemed to be "consent" to entry of the Sale Order and consummation of

2   the Sale and all transactions related thereto.

3          18.    A Qualifying Bidder, other than any Stalking Horse Purchaser, that desires to make a

4   bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the

5   Notice Parties so as to be received on or before September 19, 2018 at 12:00 p.m. (PT) (the "Bid

6   Deadline"); provided that Playhut may extend the Bid Deadline without further order of the Court,

7   subject to providing notice to the Consultation Parties. To the extent that the Bid Deadline is

8   extended for all parties, Playhut shall file a notice on the docket of this chapter 11 case indicating

9   the same. Any party that does not submit a bid by the Bid Deadline (including as extended in

10   accordance with the prior two sentences) will not be allowed to (a) submit any offer after the Bid

11   Deadline, or (b) participate in the Auction.

12          19.    All persons or entities submitting a bid are deemed to have submitted to the

13   exclusive jurisdiction of this Court with respect to all matters related to the Auction and the terms

14   and conditions of the sale or transfer of the Assets identified under the applicable Purchase

15   Agreement.

16          20.    As part of its bid, each Qualifying Bidder must provide the Debtor information

17   supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance

18   of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the

19   Bankruptcy Code (the "**Adequate Assurance Information**"), including (a) the bidder's financial

20   wherewithal and willingness to perform under any contracts that are assumed and assigned to such

21   potential bidder; (b) the name of the proposed counterparty that will act as the assignee of any

22   Contract; and (c) a contact person for the proposed assignee that affected Counterparties may

23   directly contact in connection with the adequate assurance of future performance. To the extent

24   available, the Adequate Assurance Information may also include: (x) a corporate organization chart

25   or similar disclosure identifying ownership and control of the proposed assignee; and (y) financial

26   statements, tax returns, and annual reports.

27          21.    The Debtor, the Consultation Parties, and the Counterparties to any Contracts

28   included in an applicable bid shall keep confidential all Adequate Assurance Information provided

to them under this Paragraph and shall be permitted to use and disclose such Adequate Assurance

Information only as provided in this Order unless the Qualifying Bidder that provided such

Adequate Assurance Information otherwise consents in writing. Each Counterparty in receipt of

Adequate Assurance Information shall review the Adequate Assurance Information received on a

confidential basis and shall not disclose the Adequate Assurance Information except as expressly

provided in this Paragraph. Such Counterparty may not use or disclose, except to representatives,

attorneys, advisors and financing sources (collectively, "Representatives"), any confidential

Adequate Assurance Information for any purpose other than: (a) evaluating whether adequate

assurance of future performance as required under section 365(f)(2)(B) and, if applicable, section

365(b)(3) of the Bankruptcy Code has been provided; (b) in support of any objection (the

"Assignment Objection") (subject to the limitations on disclosure set forth herein) by such

Counterparty relating to adequate assurance of future performance; and (c) if the proposed assignee

is successful and becomes a party to the Contract, on a confidential basis, in the ordinary course of

the contractual relationship. Any Assignment Objection which includes confidential, non-public

Adequate Assurance Information must be filed under seal unless disclosure of such confidential,

non-public information is authorized by the Debtor and the applicable assignee(s). This Order

authorizes the filing of any such Assignment Objections under seal, and on the docket with such

non-public information redacted, without further order of this Court; provided, that unredacted

versions of such Assignment Objections shall be served upon the Debtor and Consultation Parties,

with a copy to the Court's chambers. Any Representative receiving Adequate Assurance

Information shall be notified and shall agree to be bound by the restrictions set forth in this Order.

22.    Any Qualified Bidder who has a valid and perfected lien on any Assets of Playhut's

estate that is not subject to an objection by the commencement of the Auction (a "**Secured**

**Creditor**") shall have the right to credit bid all or a portion of the value of such Secured Creditor's

claim within the meaning of section 363(k) of the Bankruptcy Code and to the extent demonstrated

by the Secured Claim Documentation; provided that a Secured Creditor shall have the right to credit

bid its claim only with respect to the collateral by which such Secured Creditor is secured.

23.     Preferred Bank's credit bid rights are preserved.  Preferred Bank shall qualify as an overbidder for the full amount of its secured claim as of the date of its bid.  Preferred Bank shall not be required to assume any leases or executory contracts to overbid.  Preferred Bank shall not be required to provide proof of board authorization to overbid.  Preferred Bank shall not be required to provide a cash deposit to overbid.  Preferred Bank's rights against Playhut's estate and any other liable party are preserved, except to the extent that a credit bid works a credit against Preferred Bank's claims against the estate.  Preferred Bank will notify Playhut and the Committee of any such credit bid, but reserves the right to evaluate all bids, including any overbids, prior to the time of deciding whether it will make an overbid, at any time prior to the completion of the Auction, and may make a credit bid at the Auction.

24.     If only one Qualifying Bid is submitted on or before the Bid Deadline, the Debtor shall not hold an Auction and may request at the Sale Hearing that this Court approve such Qualifying Bid and the transactions contemplated thereunder. In the event that the Debtor timely receive two or more Qualifying Bids, the Debtor shall conduct the Auction on **September 21, 2018 at 9:00 a.m. (PT)** (the "**Auction Date**"), at Goe & Forsythe, LLP, 18101 Von Karman, Suite 1200, Irvine, CA 92612, or such other date and time as the Debtor, after consultation with the Consultation Parties, may notify Qualifying Bidders who have submitted Qualifying Bids; provided that such other date and time is no earlier than one (1) business days following the delivery of such notice.

25.     Each Auction Bidder shall confirm in writing that: (a) it has not engaged in any collusion with respect to the submission of any bid, the bidding or the Auction; and (b) its Qualifying Bid is a good faith bona fide offer that it intends to consummate if selected as a Successful Bidder. All proceedings at the Auction shall be transcribed.

26.     Following the Auction, the Debtor will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or otherwise best bid for the Assets.

27.     The Debtor, subject to the terms of this Order and the Bidding Procedures, shall have the right as it may reasonably determine to be in the best interests of its estate to carry out the Bidding Procedures, including, without limitation, to: (a) determine which bidders are Qualifying

Bidders; (b) determine which bids are Qualifying Bids; (c) determine which Qualifying Bid is a Baseline Bid; (d) determine which bids are the Successful Bid and Back-Up Bid, each as it relates to the Auction; (e) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtor and its estate; (f) adjourn or cancel an Auction and/or the Sale Hearing in open court without further notice (other than the filing of a notice of such adjournment or cancellation on the docket of this chapter 11 case, which notice may be the hearing agenda in the case of a Sale Hearing) or as provided in this Order and in the Bidding Procedures; (g) modify the Bidding Procedures consistent with its fiduciary duties and bankruptcy law; and (h) withdraw the Motion at any time with or without prejudice.

28.    The Debtor shall have until 12:00 Noon on the business day prior to the Sale Hearing to file and serve a reply to any objection filed in connection with the Sale, including any Sale Objection or Contract Objection.

29.    The Debtor is authorized to conduct the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

30.    In the event that there is a conflict between this Order and the Bidding Procedures, this Order shall control and govern.

31.    Prior to mailing the Assumption Notice and the Sale Notice, as applicable, the Debtor may fill in, or cause to be filled in, any missing dates and other information, correct any typographical errors, conform the provisions thereof to the provisions of this Order, and make such other, non-material changes as the Debtor deems necessary or appropriate.

32.    Playhut's CRO, in the exercise of his business judgment and in consultation with Playhut's legal advisor, will be authorized and directed to make all decisions for Playhut, and to take all necessary and appropriate actions, to implement the Bidding Procedures and the sale of Playhut's Assets. As noted above, Mr. Zheng has been invited to participate in the process as a potential bidder or plan proponent, or to the extent that Mr. Zheng waives his right to so participate, then he will participate in the process as a Consultation Party.

ACTIVE\64234876.v1-9/12/18

33.     All persons or entities that participate in the bidding process shall be deemed to have knowingly and voluntarily: (a) consented to the entry of a final order by this Court in connection with the Motion or this Order (including any disputes relating to the bidding process, the Auction and/or any Sale) to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution; and (b) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

34.     This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004(h) or 6006(d) or any other provision of the Bankruptcy Code, the Bankruptcy Rules or the Local Rules is expressly waived. The Debtor is not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and may, in its sole discretion and without further delay, take any action and perform any act authorized or approved under this Order.

35.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation or interpretation of the Order.

### 

_____

The Honorable Julia W. Brand

1

## **EXHIBIT 1**

2

**Bidding Procedures**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Robert P. Goe – SBN 137019
Stephen P. Reider – SBN 287820
GOE & FORSYTHE, LLP
18101 Von Karman Ave., Ste. 510
Irvine, CA 92612
Email: rgoe@goeforlaw.com
sreider@goeforlaw.com
Telephone: (949) 798-2460
Facsimile: (949) 955-9437

*Attorneys for Playhut, Inc.*

Rom Bar-Nissim (CA 293356)
FOX ROTHSCHILD LLP
10250 Constellation Place Ste. 900
Los Angeles, CA  90067-1506
Tel:  310-598-4150
Fax: 310-556-9828
Email: rbar-nissim@foxrothschild.com


Mette H. Kurth (CA 187100/DE 6491)
FOX ROTHSCHILD LLP
919 North Market Street, Ste. 300
Wilmington, DE 19899-2323
Tel: 302-654-7444
Fax: 302-656-8920
mkurth@foxrothschild.com

*Counsel for the Official Committee of Unsecured
Creditors*

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No. 2:18-bk-15972-WB |
| PLAYHUT, INC., | Chapter 11 |
| Debtor and Debtor-in-Possession. | **BIDDING PROCEDURES** |

On May 24, 2018 (the "**Petition Date**"), Playhut, Inc. (the "**Debtor**" or "**Playhut**") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtor is operating its business as debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

On [], 2018, the United States Bankruptcy Court for the Central District of California (the "**Court**") entered an order [Docket No.                    ] (the "**Bidding Procedures Order**"), which, among other things, authorized Playhut to solicit bids and approved these procedures (collectively, the "**Bidding Procedures**") to be employed by Playhut in connection with a sale of substantially all of its assets (collectively, the "**Assets**"), or components thereof, including but not limited to (a) Playhut's inventory, commercial leases, customer lists, licensing agreements and other executory contracts, accounts receivable, and intellectual property and (b) Playhut's surplus inventory.   Any of the foregoing shall be referred to as a "**Transaction**".

**ANY PARTY INTERESTED IN BIDDING ON THE ASSETS SHOULD CONTACT THE DEBTOR'S CRO, JAMES WONG, at jwong@armoryconsulting.com OR (714) 222-5552.**

ACTIVE\64234876.v1-9/12/18

- **Summary of Important Dates**

| | |
|---|---|
| Bidding Procedures Hearing | September 17, 2018 at 11:00 a.m. |
| Stalking Horse Designation Deadline | September 18, 2018 |
| Bid Deadline | 12:00 p.m. PT, September 19, 2018 |
| Deadline to serve Assumption Notice | September 19, 2018 |
| Deadline to object to Sale | September 20, 2018 |
| Auction Date | 9:00 a.m. PT, September 21, 2018 |
| Sale Hearing | September 24, 2018 |
| Closing Deadline | September 25, 2018 |

**1.    Assets to be Sold**

Playhut is offering for sale all of the Assets. Potential Bidders (as defined below) may bid on all or any number or combination of the Assets.

**2.    Participation Requirements**

Any person or entity that wishes to participate in the bidding process for the Assets (each, a "**Potential Bidder**") must first become a "**Qualifying Bidder**." To become a Qualifying Bidder (and thus being able to conduct due diligence and gain access to the Debtor' confidential electronic data room concerning the Assets (the "**Data Room**")), a Potential Bidder must submit to Playhut:

(i) documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated Transaction;

(ii) an executed confidentiality agreement in form and substance reasonably satisfactory to the Playhut, which by its terms will inure to the benefit of the Successful Bidder(s);

(iii) a statement and other factual support demonstrating to Playhut's reasonable satisfaction that the interested party has a *bona fide* interest in consummating a Transaction; and

(iv) sufficient information, as determined by Playhut, to allow it to determine that the interested party (i) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a Transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to Playhut in its discretion) and (ii) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by Playhut and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with a Transaction.

Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) any designated

Stalking Horse Purchaser shall be considered a Qualifying Bidder, and a Stalking Horse Agreement shall be considered a Qualifying Bid (as defined below); and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, Playhut may consider a combination of bids for the Assets.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtor, each of the Consultation Parties (as defined below), or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated Transaction.

Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) any designated Stalking Horse Purchaser shall be considered a Qualifying Bidder, and a Stalking Horse Agreement shall be considered a Qualifying Bid (as defined below); and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtor may consider a combination of bids for the Assets.

### 3.    Stalking Horse Designation

On or before September 18, 2018 (the "**Stalking Horse Deadline**"), the Debtor may, in consultation and with consent of the Consultation Parties, select a party to serve as a "**Stalking Horse Purchaser**" to acquire substantially all of the Debtor' Assets pursuant to a "**Stalking Horse Agreement**," without the need for further notice and hearing; provided, however, that any break-up fee (a "**Break-Up Fee**") shall be limited to an amount no greater than 3% of the cash portion of any Qualifying Bid, any expense reimbursement (an "**Expense Reimbursement**" and together with any associated Break-Up Fee, the "**Bid Protections**") shall be limited to an amount not to exceed $350,000. If the Debtor designate a Stalking Horse Purchaser and Stalking Horse Agreement, including any Bid Protections, in accordance with the proviso at the end of the prior sentence, they shall file a Stalking Horse Notice in accordance with the Bidding Procedures Order and submit an order approving the same under certification of counsel. The Debtor, however, reserve the right to file a Stalking Horse Notice, on or before the Stalking Horse Deadline, to designate a Stalking Horse Purchaser and Stalking Horse Agreement, including any Bid Protections, that do not meet the foregoing qualifications and seek a hearing before the Court on, or as soon as the Court is available after, September 24, 2018 to consider approval of the same.

### 4.    Bankruptcy Court Jurisdiction

Any Potential Bidders and Qualifying Bidders shall: (a) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to the Bidding Procedures, the respective Transaction proposed by each such party, the Auction (as defined below) and the construction and enforcement of the contemplated Transaction documents of such parties, (b) bring any such action or proceeding in the Court, and (c) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.

### 5.    Form of Agreement

As set forth below, Potential Bidders intending to submit bids must include with their Bids an asset purchase agreement (a "**Purchase Agreement**"). The Purchase Agreement shall be (i) if a Stalking Horse Purchaser has been designated for the applicable Assets, be upon substantially the same terms as, or terms more favorable to the Debtor and its estate than, the terms set forth in a Stalking Horse Agreement, if applicable and include a redline marked against the Stalking Horse Agreement, and (ii) otherwise, in the form of the Purchase Agreement include in the Data Room and include a redline marked against the form Purchase Agreement; or

### 6.   Due Diligence

Playhut will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that it believes to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to: Playhut's CRO James Wong at jwong@armoryconsulting.com or (714) 222-5552, or Playhut's bankruptcy counsel Robert Goe at rgoe@goeforlaw.com or (949) 798-2460

The due diligence period shall extend through and including the Bid Deadline. Playhut may, but shall not be obligated to, in its sole discretion, furnish any due diligence information after the Bid Deadline. Playhut reserves the right, in its reasonable discretion, to withhold or limit access to any due diligence information that it determines is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder. Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, Playhut and its estate shall be authorized to provide due diligence information to Qualifying Bidders provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to Playhut. Playhut and its estate is not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures and a contemplated Transaction.

### 7.   Bid Requirements

Other than in the case of a bid submitted by the Stalking Horse Purchaser, to be deemed a "**Qualifying Bid**," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements, as determined by the Playhut's CRO in consultation with the Consultation Parties (each, a "**Bid Requirement**"):

    a.    be in writing;

    b.    fully disclose the identity of the Qualifying Bidder (and any other party participating in the bid) and provide the contact information of the specific person(s) whom Playhut or its advisors should contact in the event that Playhut has any questions or wishes to discuss the bid submitted by the Qualifying Bidder;

    c.    set forth the purchase price to be paid by such Qualifying Bidder;

    d.    if a bid includes a credit bid under section 363(k), evidence of the amount of the claim, the Assets constituting the collateral securing

the claim, and evidence of the grant, perfection, priority, and validity of the lien (the "Secured Claim Documentation");

e.    state the liabilities proposed to be paid or assumed by such Qualifying Bidder;

f.    specify the Assets that are included in the bid and, to the extent a Stalking Horse Purchaser is designated, state that such Qualifying Bidder offers to purchase the Assets, or a number or combination of the Assets, upon substantially the same terms as, or terms more favorable to the Playhut and its estate than, the terms set forth in the Stalking Horse Agreement, as applicable;

g.    state that such Qualifying Bidder's offer is formal, binding and unconditional and is irrevocable until two (2) business days after the closing of the sale of the Assets;

h.    state that such Qualifying Bidder is financially capable of consummating the Transaction contemplated by the bid and provide written evidence in support thereof;

i.    contain such financial and other information to allow Playhut and the Consultation Parties to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the proposal, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows Playhut to serve, no later than September 19, 2018, such information on any counterparties to any contracts or leases being assumed and assigned (or assumed) in connection with the Transaction that have requested, in writing, such information;

j.    identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the contemplated transaction(s);

k.    specify whether the Qualifying Bidder intends to operate all or a portion of Playhut's business as a going concern;

l.    if the Transaction contemplated by the proposal is a sale, a commitment to close the Transaction by September 25, 2018;

m.    not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement or similar type of fee or payment;

ACTIVE\64234876.v1-9/12/18

n.   in the event that there is a Stalking Horse Purchaser, the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (A) the purchase price under the Stalking Horse Agreement, (B) any Break-Up Fee, (C) any Expense Reimbursement, and (D) $25,000 (the "Minimum Initial Bid");

o.   not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval or due diligence;

p.   contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the proposed Transaction;

q.   provides for the Qualifying Bidder to serve as a backup bidder (the "Back-Up Bidder") if the Qualifying Bidder's bid is the next highest and best bid (the "Back-Up Bid") after the Successful Bid (as defined below);

r.   includes written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the subject term sheet;

s.   provides a good faith cash deposit (the "Deposit") in an amount equal to ten percent (10%) of the purchase price provided for in the proposal (or such additional amount as may be determined by Playhut in its reasonable discretion and in consultation with the Consultation Parties) to be deposited, prior to the Bid Deadline, with an escrow agent selected by Playhut (the "Escrow Agent") pursuant to the escrow agreement to be provided by Playhut to the Qualifying Bidders (the "Escrow Agreement"); and

t.   provides for liquidated damages in the event of the Qualifying Bidder's breach of, or failure to perform under, the modified Purchase Agreement equal to the amount of the Deposit.

Playhut reserves the right, in consultation with the Consultation Parties, to negotiate with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

## 8.   Bid Deadline

A Qualifying Bidder, other than any Stalking Horse Purchaser, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Notice Parties so as to be received on or before **September 19, 2018 at 12:00 p.m. (PT)** (the "**Bid Deadline**"); *provided* that Playhut may extend the Bid Deadline without further order of the Court, subject to providing notice to the Consultation Parties. To the extent that the Bid Deadline is extended for all parties, Playhut shall file a notice on the docket of this chapter 11 case indicating the same. **Any party that does not submit a bid by the Bid Deadline (including as extended in accordance with the prior two sentences) will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.**

## 9.   Evaluation of Qualifying Bids

Playhut will deliver by no later than 5:00 p.m. (PT) on the day of the Bid Deadline, copies of all bids from Qualifying Bidders to each of the Consultation Parties.

Playhut, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid, and shall notify all Qualifying Bidders whether their bids have been determined to be a Qualifying Bid by no later than 12:00 p.m. (PT) on the day before the commencement of the Auction. In the event that a bid is determined not to be a Qualifying Bid, including with respect to any proposed credit bid amount, the Qualifying Bidder shall be notified by Playhut and shall have until the commencement of the Auction to modify its bid to increase the purchase price or otherwise improve the terms of the Qualifying Bid for Playhut and to provide additional Secured Claim Documentation; provided that any Qualifying Bid may be improved at the Auction as set forth herein.

Prior to commencing the Auction, Playhut shall determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (the "**Baseline Bid**" and the Qualifying Bidder submitting the Baseline Bid, the "**Baseline Bidder**"), and shall notify any Stalking Horse Purchaser and all Qualifying Bidders with Qualifying Bids of the Baseline Bid no later than the opening of the Auction.

## 10.   No Qualifying Bids

If no timely Qualifying Bids other than any Stalking Horse Purchaser's Qualifying Bid are submitted on or before the Bid Deadline, the Debtor shall not hold an Auction and may request at the Sale Hearing that the Stalking Horse Purchaser (if any) be deemed the Successful Bidder (as defined herein) and that the Court approve the Stalking Horse Agreement (if any) and the transactions contemplated thereunder.

## 11.   Right to Credit Bid

Any Qualified Bidder who has a valid and perfected lien on any Assets of the Debtor's estate that is not subject to an objection by the commencement of the Auction (a "**Secured Creditor**") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claim within the meaning of section 363(k) of the Bankruptcy Code and to the extent demonstrated by the Secured Claim Documentation; *provided* that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured.

Preferred Bank's credit bid rights are preserved. Preferred Bank shall qualify as an overbidder for the full amount of its secured claim as of the date of its bid. Preferred Bank shall not be required to assume any leases or executory contracts to overbid. Preferred Bank shall not be required to provide proof of board authorization to overbid. Preferred Bank shall not be required to provide a cash deposit to overbid. Preferred Bank's rights against Playhut's estate and any other liable party are preserved, except to the extent that a credit bid works a credit against Preferred Bank's claims against the estate. Preferred Bank will notify Playhut and the Committee of any such credit bid, but reserves the right to evaluate all bids, including any overbids, prior to the time of deciding whether it will make an overbid, at any time prior to the completion of the Auction, and may make a credit bid at the Auction.

## 12.    Auction

If Playhut timely receives one or more Qualifying Bids for any of the Assets (inclusive of any Stalking Horse Purchaser's Qualifying Bid), then Playhut shall conduct an auction (the "Auction"). Following the Auction, Playhut will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors:

i.    the terms of the Purchase Agreement requested by each bidder;

ii.    the extent to which such terms are likely to delay closing of the Sale, the cost to Playhut and its estate of such modifications or delay, and any incremental financing being offered to accommodate any delay;

iii.    the total consideration to be received by Playhut and its estate;

iv.    the Transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval;

v.    the net benefit to Playhut's estate, taking into account any Break-Up Fee and any Expense Reimbursement provided for in any applicable Stalking Horse Agreement;

vi.    the impact on employees, trade creditors and lease and contract counterparties; and

vii.    any other factors Playhut or the Consultation Parties may reasonably deem relevant.

ACTIVE\64234876.v1-9/12/18

The Auction shall be governed by the following procedures:

i.    the Auction shall commence on **September 21, 2018 at 9:00 a.m. (PT)** (the "Auction Date"), at Goe & Forsythe, LLP, 18101 Von Karman, Suite 1200, Irvine, CA 92612;

ii.   only a Stalking Horse Purchaser and the other Qualifying Bidders with Qualifying Bids (collectively, the "**Auction Bidders**") shall be entitled to make any subsequent bids at the Auction;

iii.  the Auction Bidders shall appear in person at the Auction, or through a duly authorized representative;

iv.   only Playhut, the Auction Bidders, the Consultation Parties, and Playhut's creditors and equity holders, together with the professional advisors to each of the foregoing parties, may attend the Auction; provided that any creditors, other than members or representatives of the Committee, desiring to attend the Auction must provide counsel for Playhut one business day's written notice of their intent to attend the Auction;

v.    Playhut and its professional advisors shall direct and preside over the Auction;

vi.   the Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction or the Sale;

vii.  bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids, with the first such bid to be at least equal to the Minimum Overbid Amount and all subsequent successive bids to be in increments of at least $25,000 (the "**Bid Increment**"); *provided* that Playhut shall retain the right to modify the bid increment requirements on the record at the Auction in consultation with the Consultation Parties;

viii. the Auction may include individual off-record negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

ix.   all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and Playhut shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding Playhut's announcement of the then-current highest and best bid;

x.    Playhut, in consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.,* the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any applicable order of the Court entered in connection with these chapter 11

cases, including, without limitation, the Bidding Procedures Order, and (ii) disclosed to the Auction Bidders;

xi.  each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

xii.  Auction Bidders shall have the right to make additional modifications to their respective Purchase Agreements or any Stalking Horse Agreement, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in Playhut's discretion, in consultation with the Consultation Parties, be less favorable to Playhut and its estate than the terms of the Auction Bidders' respective Purchase Agreements or any Stalking Horse Agreement, as applicable, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Back-Up Bid, which shall remain binding as provided for herein;

xiii.  Playhut and the Consultation Parties shall have the right to request any additional financial information that will allow Playhut and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal or any Stalking Horse Agreement, as applicable, as may be amended during the Auction, and any further information that Playhut may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

xiv.  upon the conclusion of the Auction, Playhut shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets that is or are the highest or best from among the Qualifying Bids submitted at the Auction, which may be a Stalking Horse Agreement (the "**Successful Bid**"). In making this decision, Playhut shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the likelihood of the bidder's ability to close a transaction and the timing thereof, the nature and impact of any variances from the form Purchase Agreement requested by each bidder, and the net benefit to Playhut's estate. The bidder submitting such Successful Bid, which may be the Stalking Horse Purchaser, shall become the "**Successful Bidder**," and

shall have such rights and responsibilities of the purchaser as set forth in the subject Purchase Agreement, as applicable. Playhut may, in its sole discretion subject only to consultation with the Consultation Parties, designate Back-Up Bids (and the corresponding Back-Up Bidders) to purchase the Assets in the event that the Successful Bidder does not close the Sale; and

xv.     prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

**THE SUCCESSFUL BID AND ANY BACK-UP BIDS SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED. EACH QUALIFYING BID THAT IS NOT THE SUCCESSFUL BID OR BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, IF THE SUCCESSFUL BID IS IN THE FORM OF A RESTRUCTURING TERM SHEET, ANY BACK-UP BID SHALL REMAIN IRREVOCABLE AND BINDING ON THE BACK-UP BIDDER UNTIL TWO (2) BUSINESS DAY AFTER THE ENTRY OF AN ORDER CONFIRMING THE SUCCESSFUL BID IN THE FORM OF A RESTRUCTURING TERM SHEET AS THE SUCCESSFUL BID (OR SUCH FURTHER PERIOD SET FORTH IN ANY ORDER ENTERED AT THE SALE HEARING).**

**13.     Sale Hearing**

The Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of any Stalking Horse Purchaser is received, then the Stalking Horse Agreement) will be subject to approval by the Court. The hearing to approve such Successful Bid and any Back-Up Bid (the "Sale Hearing") shall take place, subject to the Court's availability, on **September 24, 2018**. The Sale Hearing may be adjourned by Playhut from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a hearing agenda or notice on the docket of Playhut's chapter 11 case. **For the avoidance of doubt, by no later than the time of announcement of the Baseline Bid for the Auction, Playhut may determine, in consultation with the Consultation Parties, to withdraw the Assets or any subset thereof, from the Auction and sale process, and adjourn the Sale Hearing with respect to these Assets on the terms set forth herein.**

At the Sale Hearing, Playhut will seek entry of an order that, among other things:

i.     authorizes and approves the Sale to the Successful Bidder (and, if applicable the Back-Up Bidder), pursuant to the terms and conditions set forth in the

applicable Stalking Horse Agreement or Purchase Agreement executed by the Successful Bidder (and, if applicable the Back-Up Bidder), and that the Assets being transferred in such transaction shall be transferred free and clear of all liens claims and Encumbrances pursuant to section 363(f) of the Bankruptcy Code;

ii.    unless otherwise ordered by the Court, directing that all Encumbrances on the Assets that are sold shall attach to the cash proceeds generated from the sale of such Assets in the same order of priority as they existed prior to the consummation of such sale;

iii.    finding that the Stalking Horse Purchaser or Successful Bidder, as applicable, is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code; and

iv.    as appropriate, exempting the Sale(s) and conveyance(s) of the Assets from any transfer tax, stamp tax or similar tax, or deposit under any applicable bulk sales statute.

### 14.    Back-Up Bidder

Notwithstanding any of the foregoing, in the event that the Successful Bidder fails to close the Sale by September 25, 2018 (or such date as may be extended by Playhut, in consultation with the Consultation Parties, the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and Playhut will be authorized, but not directed, to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties, as soon as practicable, but not later than September 27, 2018.

### 15.    Return of Deposits

All Deposits shall be returned to each bidder not selected by Playhut as the Successful Bidder or the Back-Up Bidder no later than three (3) business days following the conclusion of the Sale Hearing. The deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale. If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Purchase Agreement or any Stalking Horse Agreement, as applicable, Playhut and its estate shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to Playhut and its estate for such breach or failure to perform.

### 16.    Notice and Consultation Parties

(a)    The term "Notice Parties" as used in these Bidding Procedures shall mean: (i) counsel to the Debtor, Goe & Forsythe, LLP, 18101 Von Karman Ave., Ste. 510, Irvine, CA 92612 (Attn: Robert P. Goe and Stephen P. Reider), (ii) counsel to the Official Committee of Unsecured Creditors of Playhut, Inc., Fox Rothschild LLP, 10250 Constellation Place, Ste. 900, Los Angeles, CA 90067-1506 (Attn: Mette H. Kurth and Rom Bar-Nissim); (iii) counsel to Preferred Bank; (iv) the Office of the

United States Trustee for the Central District of California; and (v) counsel to the Stalking Horse Purchaser[, if any].

(b)    The term "Consultation Parties" as used in these Bidding Procedures shall mean: (i) counsel to the official committee of unsecured creditors appointed in the Debtor' chapter 11 cases (the "Committee"); (ii) counsel to Preferred Bank; and (iii) if Mr. Zheng will not be participating as a potential bidder or plan proponent, Mr. Zheng.

For the avoidance of doubt, any consultation rights provided to the Consultation Parties by these Bidding Procedures shall not limit the Debtor's discretion in any way and shall not include the right to veto any decision made by the Debtor in the exercise of its business judgment.

If a member of the Committee submits a Qualifying Bid, the Committee will continue to have consultation rights as set forth in these Bidding Procedures; *provided* that the Committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets and shall not provide any information regarding the sale of the Assets to such member.

In the event that any Consultation Party (other than the Committee) or an affiliate of any of the foregoing submits a bid that is a Qualifying Bid, any obligation of the Debtor to consult with the bidding party established under these Bidding Procedures will be waived, discharged and released without further action; *provided* that the bidding party will have the same rights as any other Qualifying Bidder set forth above.

## 17.    Reservation of Rights

Notwithstanding any of the foregoing, Playhut reserves the right to, after consultation with the Consultation Parties, modify these Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, allow for bidding on only a portion of the Assets and not all of them, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing.

1

## <u>EXHIBIT 2</u>

2

**Assumption Notice**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Robert P. Goe – SBN 137019
Stephen P. Reider – SBN 287820
GOE & FORSYTHE, LLP
18101 Von Karman Ave., Ste. 510
Irvine, CA 92612
Email: rgoe@goeforlaw.com
sreider@goeforlaw.com
Telephone: (949) 798-2460
Facsimile: (949) 955-9437

*Attorneys for Playhut, Inc.*

Rom Bar-Nissim (CA 293356)
FOX ROTHSCHILD LLP
10250 Constellation Place Ste. 900
Los Angeles, CA  90067-1506
Tel:  310-598-4150
Fax: 310-556-9828
Email: rbar-nissim@foxrothschild.com

Mette H. Kurth (CA 187100/DE 6491)
FOX ROTHSCHILD LLP
919 North Market Street, Ste. 300
Wilmington, DE 19899-2323
Tel: 302-654-7444
Fax: 302-656-8920
mkurth@foxrothschild.com

*Counsel for the Official Committee of Unsecured
Creditors*

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## LOS ANGELES DIVISION

In re:

PLAYHUT, INC.,

              Debtor and Debtor-in-
              Possession.

Case No. 2:18-bk-15972-WB

Chapter 11

**NOTICE OF POSSIBLE ASSUMPTION AND
ASSIGNMENT  AND CURE AMOUNTS
WITH RESPECT TO EXECUTORY
CONTRACTS AND UNEXPIRED LEASES OF
THE DEBTOR**

       On May 24, 2018 (the "**Petition Date**"), Playhut, Inc. (the "**Debtor**" or "**Playhut**")
filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code
(the "**Bankruptcy Code**"). Playhut is operating its business as debtor in possession pursuant
to section 1107(a) and 1108 of the Bankruptcy Code. Playhut is seeking to assume and assign
certain of its executory contracts and unexpired leases in connection with the sale (the "**Sale**") of all
or substantially all of its assets (collectively, the "**Assets**"), or some subset(s) thereof. Playhut
is seeking Court approval of such Sale and assumptions and assignments pursuant to a motion, dated
September 13, 2018 [Docket No. *] (the "**Motion**").

       The Court has entered an order (the "**Bidding Procedures Order**")[3] approving certain
Bidding Procedures that will govern the sale of Playhut's Assets to the highest or best bidder and
certain Assumption and Assignment Procedures governing the transfer of unexpired leases and

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding
Procedures Order.

ACTIVE\64234876.v1-9/12/18

executory contracts to a Successful Bidder. Copies of the Motion and the Bidding Procedures Order are available from Playhut's bankruptcy counsel, Robert P. Goe, at rgoe@goeforlaw.com or (949) 798-2460.

[The Debtor is proposing to sell the Assets to [_____] (the "**Stalking Horse Purchaser**") pursuant to the terms of the Stalking Horse Agreement, which was filed with the Court on _____, 2018 [Docket No. *], subject to higher or otherwise better offers submitted under the Bidding and Auction Process.]

**You are receiving this Notice because you may be a party to an unexpired lease or an executory contract that is potentially to be assumed and assigned (collectively, the "Contracts"), in connection with such Sale. A list of the Contracts is attached hereto as Exhibit A.**

Playhut has determined the current amounts owing (the "**Cure Amounts**") under each Contract and have listed the applicable Cure Amounts on <u>Exhibit A</u> attached hereto. The Cure Amounts are the only amounts proposed to be paid upon any assumption and assignment of the Contracts, in full satisfaction of all amounts outstanding under the Contracts.

If a Counterparty objects to (i) the Cure Amount for its Contract or (ii) Playhut's ability to assume and assign the Contract, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined below) a written objection (a "**Contract Objection**"). **Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Bankruptcy Court, together with proof of service, <u>on or before  September 20, 2018 (the "Contract Objection Deadline"); (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Assumed Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.** If a Counterparty objects to the provision of adequate assurance of future performance by a Successful Bidder, such objection may be asserted after the Successful Bidder is designated in accordance with the Bid Procedures. For the avoidance of doubt, all adequate assurance objections shall be filed not later than two (2) hours prior to the commencement of the Sale Hearing.  **The "Objection Notice Parties" are as follows: (i) counsel to the Debtor, Goe & Forsythe, LLP, 18101 Von Karman Ave., Ste. 510, Irvine, CA 92612 (Attn: Robert P. Goe and Stephen P. Reider), (ii) counsel to the Official Committee of Unsecured Creditors of Playhut, Inc., Fox Rothschild LLP, 10250 Constellation Place, Ste. 900, Los Angeles, CA 90067-1506 (Attn: Mette H. Kurth and Rom Bar-Nissim); (iii) counsel to Preferred Bank; (iv) the Office of the United States Trustee for the Central District of California; and (v) counsel to the Stalking Horse Purchaser[, if any]. If no objection is timely received with respect to Cure Amount, (i) a non-Debtor party to a Contract shall be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Contract, (ii) the Cure Amount set forth on <u>Exhibit A</u> attached hereto shall be controlling, notwithstanding anything to the contrary in any Contract, or any other document, and the non-Debtor party to a Contract shall be deemed to have consented to the Cure Amount, and (iii) the non-Debtor party to a Contract shall be forever barred and estopped from asserting any other claims related to such Contract against the Debtor or the applicable transferee, or the property of any of them.**

**If no objection is received by the Contract Objection Deadline to any Stalking Horse Bidder's adequate assurance of future performance with respect to a Contract, a non-Debtor party to such Contract shall be deemed to have consented to the assumption, assignment, and/or transfer of the applicable Contract to the applicable Stalking Horse Bidder, and shall be forever barred and estopped from asserting or claiming that any conditions to such assumption, assignment, and/or transfer must be satisfied under such applicable Contract or that any**

**related right or benefit under such applicable Contract cannot or will not be available to the applicable Stalking Horse Bidder.**

Subject to the terms of the Bidding Procedures Order, an auction (the "**Auction**") for the Assets, including the Contracts, shall commence on **September 21, 2018 at 9:00 a.m. (PT)** (the "**Auction Date**"), at Goe & Forsythe, LLP, 18101 Von Karman, Suite 1200, Irvine, CA 92612. As soon as reasonably practicable after the Auction, Playhut will file and serve a notice that identifies the Successful Bidder for the Assets, including any Contracts. **If the Successful Bidder is not a Stalking Horse Bidder, then the deadline to object to adequate assurance of future performance with respect to such Successful Bidder will be extended to two (2) hours prior to the commencement of the Sale Hearing; *provided* that the deadline to object to the Cure Amounts with respect to such Contracts, and to otherwise object to the assumption and assignment of such Contracts, shall not be extended.**

**Playhut will seek to assume and assign the Contracts that have been selected by a Successful Bidder (collectively, the "Selected Assumed Contracts") at a hearing before the Honorable Judge Julia W. Brand, in the United States Bankruptcy Court for the Central District of California, 255 E. Temple Street, Suite 1382 / Courtroom 1375, Los Angeles, CA 90012 (a "Sale Hearing") on September 24, 2018 at 1:30 p.m. (ET), or such other date as determined by Playhut in accordance with the terms of the Bidding Procedures Order.** To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the Cure Amount (any such dispute, a "**Cure Dispute**"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by Playhut or fixed by the Court; *provided*, *however*, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assumed Contract may be assumed by Playhut and assigned to the Successful Bidder, provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by Playhut or any Successful Bidder, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

Dated: September 13, 2018          **GOE & FORSYTHE, LLP**

                                   **By:  */s/ Robert P. Goe***
                                        Robert P. Goe
                                        *Attorneys for Playhut, Inc.*


                                   **FOX ROTHSCHILD LLP**

                                   **By:  */s/ Mette H. Kurth***
                                        Mette H. Kurth
                                        *Counsel for the Official Committee of Unsecured Creditors*

ACTIVE\64234876.v1-9/12/18

1

**<u>Exhibit A to Assumption Notice</u>**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>EXHIBIT 3</u>**

**Sale Notice**

Robert P. Goe – SBN 137019
Stephen P. Reider – SBN 287820
GOE & FORSYTHE, LLP
18101 Von Karman Ave., Ste. 510
Irvine, CA 92612
Email: rgoe@goeforlaw.com
sreider@goeforlaw.com
Telephone: (949) 798-2460
Facsimile: (949) 955-9437

*Attorneys for Playhut, Inc.*

Rom Bar-Nissim (CA 293356)
FOX ROTHSCHILD LLP
10250 Constellation Place Ste. 900
Los Angeles, CA  90067-1506
Tel: 310-598-4150
Fax: 310-556-9828
Email: rbar-nissim@foxrothschild.com

Mette H. Kurth (CA 187100/DE 6491)
FOX ROTHSCHILD LLP
919 North Market Street, Ste. 300
Wilmington, DE 19899-2323
Tel: 302-654-7444
Fax: 302-656-8920
mkurth@foxrothschild.com

*Counsel for the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION**

In re:

PLAYHUT, INC.,

              Debtor and Debtor-in-Possession.

Case No. 2:18-bk-15972-WB

Chapter 11

**NOTICE OF ENTERED BIDDING PROCEDURES ORDER AND PROPOSED SALE**

**PLEASE TAKE NOTICE** that Playhut, Inc. (the "**Debtor**" or "**Playhut**") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), on May 23, 2018 (the "**Petition Date**"), in the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**"). Playhut is seeking to sell (the "**Sale**") all or substantially all of its assets (collectively, the "**Assets**"), or subset(s) thereof, free and clear of all liens, claims, encumbrances, and other interests. [The Debtor is proposing to sell the Assets to [] (the "**Stalking Horse Purchaser**") pursuant to the terms of the Stalking Horse Agreement, which was filed with the Court on _____, 2018 [Docket No. *], subject to higher or otherwise better offers submitted under the Bidding and Auction Process.]

**PLEASE TAKE FURTHER NOTICE** that by order dated [    ], 2018 [Docket No. *] (the "**Bidding Procedures Order**")[4] the Bankruptcy Court approved certain "Bidding Procedures" that govern the Sale. All interested parties should carefully read the Bidding Procedures Order and the Bidding Procedures. Copies of the Bidding Procedures Order and the Bidding Procedures are available from

---

[4] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order.

ACTIVE\64234876.v1-9/12/18

Playhut's bankruptcy counsel, Robert P. Goe, at rgoe@goeforlaw.com or (949) 798-2460. A separate notice will be provided to counterparties to executory contracts and unexpired leases with the Debtor that may be assumed and assigned in connection with the Sale. **Any interested bidder should contact Playhut's CRO at jwong@armoryconsulting.com or (714) 222-5552.**

    **PLEASE TAKE FURTHER NOTICE OF THE FOLLOWING INFORMATION AND IMPORTANT DEADLINES IN CONNECTION WITH THE SALE, WHICH DATES AND DEADLINES SUPERSEDE ANY DATES AND DEADLINES SET FORTH IN THE MOTION [DOCKET NO.        ] PREVIOUSLY FILED AND SERVED BY THE DEBTOR.**

- The deadline to submit a bid for any Assets is **September 19, 2018 at 12:00 p.m. (PT)**.

- Any objections to the Sale or the relief requested in connection with the Sale (a "**Sale Objection**"), other than a Contract Objection, which shall be governed by the Assumption and Assignment Procedures, must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the Clerk of this Court, together with proof of service, **on or before September 20, 2018** (the "**Sale Objection Deadline**"); and (e) be served, so as to be actually received on or before the Sale Objection Deadline, upon the Objection Notice Parties. The "**Objection Notice Parties**" are as follows: (i) counsel to the Debtor, Goe & Forsythe, LLP, 18101 Von Karman Ave., Ste. 510, Irvine, CA 92612 (Attn: Robert P. Goe and Stephen P. Reider), (ii) counsel to the Official Committee of Unsecured Creditors of Playhut, Inc., Fox Rothschild LLP, 10250 Constellation Place, Ste. 900, Los Angeles, CA 90067-1506 (Attn: Mette H. Kurth and Rom Bar-Nissim); (iii) counsel to Preferred Bank; (iv) the Office of the United States Trustee for the Central District of California; and (v) counsel to the Stalking Horse Purchaser[, if any].

- An auction for the Assets, unless cancelled or adjourned in accordance with the Bidding Procedures Order, will be held on **September 21, 2018 at 9:00 a.m. (PT)**, at the offices of Goe & Forsythe, LLP, 18101 Von Karman, Suite 1200, Irvine, CA 92612.

- Unless adjourned in accordance with the Bidding Procedures Order, the Bankruptcy Court will conduct a hearing (the "**Sale Hearing**") to consider the Sale on September 24, 2018.

    **PLEASE TAKE FURTHER NOTICE THAT IF A SALE OBJECTION IS NOT FILED AND SERVED ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE ENTERED BIDDING PROCEDURES ORDER, THE OBJECTING PARTY SHALL BE BARRED FROM OBJECTING TO THE SALE AND SHALL NOT BE HEARD AT THE SALE HEARING, AND THE BANKRUPTCY COURT MAY ENTER THE SALE ORDER WITHOUT FURTHER NOTICE TO SUCH PARTY.**

Dated:  September 13, 2018          **GOE & FORSYTHE, LLP**

                    **By:** */s/ Robert P. Goe*
                        Robert P. Goe
                    *Attorneys for Playhut, Inc.*


                    **FOX ROTHSCHILD LLP**

                    **By:** */s/ Mette H. Kurth*
                        Mette H. Kurth
                    *Counsel for the Official Committee of Unsecured Creditors*

ACTIVE\64234876.v1-9/12/18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ACTIVE\64234876.v1-9/12/18

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 18101 Von Karman Avenue, Suite 1200, Irvine, CA 92612

A true and correct copy of the foregoing document entitled (*specify*): **EMERGENCY MOTION FOR ENTRY OF AN ORDER: (A)(I) SCHEDULING A HEARING ON THE APPROVAL OF THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (II) APPROVING CERTAIN BIDDING PROCEDURES, ASSUMPTION AND ASSIGNMENT PROCEDURES, AND THE FORM AND MANNER OF NOTICE THEREOF, AND (III) GRANTING RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE AGREEMENT, (II) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) September 13, 2018, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) September 13, 2018, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) September 13, 2018, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 13, 2018 | Kerry A. Murphy | /s/Kerry A. Murphy |
|---|---|---|
| Date | Printed Name | Signature |

48

ACTIVE\64185774.v3-9/12/18

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) September 13, 2018, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Raymond H. Aver     ray@averlaw.com
- Steven P Chang     heidi@spclawoffice.com, schang@spclawoffice.com,assistant1@spclawoffice.com,attorney@spclawoffice.com;g9806@notify. cincompass.com;chenghr75251@notify.bestcase.com
- Theodore A Cohen     tcohen@sheppardmullin.com, amontoya@sheppardmullin.com
- Lauren A Deeb     lauren.deeb@nelsonmullins.com, zora.thomas@nelsonmullins.com;lori.stewart@nelsonmullins.com
- Lei Lei Wang Ekvall     lekvall@swelawfirm.com, csheets@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- Michael G Fletcher     mfletcher@frandzel.com, sking@frandzel.com
- Robert P Goe     kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com
- Stella A Havkin     stella@havkinandshrago.com, havkinlaw@earthlink.net;r49306@notify.bestcase.com
- Bradford G Hughes     bhughes@Clarkhill.com, scontreras@clarkhill.com
- Shanna Kaminski     skaminski@schaferandweiner.com, pjozwiak@schaferandweiner.com
- Mette H Kurth     mkurth@foxrothschild.com, mette-kurth-7580@ecf.pacerpro.com
- Alvin Mar     alvin.mar@usdoj.gov
- Robert S Marticello     Rmarticello@swelawfirm.com, csheets@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- Thomas J Polis     tom@polis-law.com, paralegal@polis-law.com;r59042@notify.bestcase.com
- Stephen Reider     sreider@goeforlaw.com, kmurphy@goeforlaw.com;campbellwr79778@notify.bestcase.com
- Ryan M Salzman     ryan.salzman@dbr.com, willie.ackart@dbr.com
- United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
- Reed S Waddell     rwaddell@frandzel.com, sking@frandzel.com
- Gerrick Warrington     gwarrington@frandzel.com, dwise@frandzel.com

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) September 13, 2018, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed:

|  |  |  |
|---|---|---|
| **In re Playhut, Inc.**<br>**USBC Case No. 2:18-bk-15972-WB** | **Debtor**<br>Playhut, Inc.<br>18560 San Jose Avenue<br>City of Industry, CA 91748-1365 | **United States Trustee**<br>United States Trustee<br>915 Wilshire Blvd., Suite 1850<br>Los Angeles, CA 9017 |

**CREDITORS**

49

1

2   1 West Capital, LLC
    1250 East Hallandale Beach          Beyer Law Group, LLC              Beyer Law Group, LLC
    Blvd.                               ~~PO Box 1687~~                    ~~20450 Stevens Creek Blvd., Suite 200~~
3   Suite 409                           ~~Cupertino, CA 95015-1687~~       ~~Cupertino, CA 95014~~
    Hallandale, FL 33009                RTS Unable to Fwd 06-14-18         RTS Unable to Fwd 06-18-18

4

5   Buyers Support Group, Inc.          Changzhou Kangyuan Plastic Co. Lt
    ~~10025 Valley View Road~~           No 59 Liujiang Lane, East of      CHINA-BASE NINGBO FOREIGN TRADE
    ~~Suite 150~~                        ~~Jiadiantange~~                   No 666 Tian Tong South Road
6   ~~Eden Prairie, MN 55344~~           ~~New District Changzhou City, China~~  Yinzhou District, China
    FOE – 05/30/18                      RTS Unable to Fwd 06-18-18

7

8   Citi Capital                        DELL BUSINESS CREDIT              Dillman Sales, Inc.
    35-12 19th Avenue 3-West            Payment Processing Center        1911 SW Campus Drive
9   Astoria, NY 11105-1001              PO BOX 5275                      Suite 778
                                        Carol Stream, IL 60197-5275      Federal Way, WA 98023

10

11  Disney Consumer Prod. Latin
    AM                                  Dreamworks Animation, LLC        EAST GRACE CORPORATION
    Two Alhambra Plaza                  1000 Flower Street               395 Zhongshan Road
12  9th Floor                           Glendale, CA 91201               Wuxi, Jiangsu   China
    Miami, FL 33134

13

14  East-West Associates, Inc.          EBF Partners, LLC                Emard, Danoff et al
    14821 Northam Street                dba Everest Business Funding     ~~Attn Eric Danoff & Talcott N. Bates~~
15  La Mirada, CA 90638                 5 West 37th Street               ~~49 Stevenson Street, Suite 400~~
                                        2nd Floor                        ~~San Francisco, CA 94105~~
                                        New York, NY 10018-5385          RTS Unable to Fwd 06-06-18

16

17  ENTERTAINMENT ONE UK                Faith P. Hill, Esq.              HANGZHOU CHINA TEXTILE IMP&EXP
    LIMITED                             BARRETT PARTNERS GROUP, LL        ~~6 F, A Building Kaixuanmen~~
    45 Warren Street                    2330 Scenic Hwy                  ~~Business Centre, No 11, Qingchun Rd~~
18  London, UK                          Snellville, GA 30078             ~~Hangzhou City, China~~
                                                                         RTS Unable to Fwd 06-16-18

19

20  Hangzhou China Textile Import
    & Exp                               HANGZHOU TAIYUAN OUTDOOR          Hasbro Entertainment
    ~~1601 N Sepulveda Blvd.~~           Building 3 No. 2 Fengcheng Rd Pinç  1027 Newport Ave.
21  ~~Manhattan Beach, CA 90266-~~       Town Yuhang District             Pawtucket, RI 02862-1059
    ~~6511~~                             Hangzhou  China
    RTS Unable to Fwd 06-06-18

22

23  Heartland Payment Systems,          **Counsel to Hangzhou China**
    LLC                                 **Textile Imp & Exp**             MARKET UNION CO., LTD
    ~~5215 Sepulveda Blvd~~              Law Offices of Steven P Scandura  8F, No. 1 Building, Hi-Tech
24  ~~Culver City, CA 90230~~            1601 N Sepulveda Blvd.           Science and Technology
    RTS Unable to Fwd 06-03-18          Suite 730                        Square No. 1498, Jiangnan Rd
                                        Manhattan Beach, CA 90266         Ningbo, Zhejiang,  China

25

26  Meserve Mumper Hughes, LLP          NINGBO DEMEI HOME TEXTILE C
    ~~300 South Grand Avenue~~           LTD                              OO Sales Inc.
    ~~24th floor~~                        No. 368 Yinxian Avenue           934 St Andrews Circle
27  ~~Los Angeles, CA 90071-3185~~       Yinzhou District                 Geneva, IL 60134
    RTS Unable to Fwd 06-06-18          Ningbo, Zhejiang,  China

28

ACTIVE\64185774.v3-9/12/18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | | |
|---|---|---|
| OO Sales, Inc.<br>~~1275 W Roosevelt Rd~~<br>~~West Chicago, IL 60185~~<br>RTS Unable to Fwd 06-06-18 | OOCL<br>111 West Ocean Blvd<br>Suite 1700<br>Long Beach, CA 90802 | Orca Pacific Manufacturers Rep, LLC<br>1000 Dexter Avenue North<br>Suite 530<br>Seattle, WA 98109 |
| Orca Pacific Manufacturers<br>Rep, LLC<br>~~500 Yale Avenue North~~<br>~~Seattle, WA 98100~~<br>RTS Unable to Fwd 06-06-18 | PAC Operating Limited Partners<br>PO Box 742339<br>Los Angeles, CA 90074-2339 | PAC Operating Ltd Partnership<br>841 Apollo Street<br>Suite 350<br>El Segundo, CA 90245 |
| Patent Category Corp.<br>382 N. Lemon Avenue<br>Suite 189<br>Walnut, CA 91789 | Patent Category Corporation<br>~~368 South Cheryl Lane~~<br>~~Walnut, CA 91789~~<br>RTS Unable to Fwd 07-29-18 | Preferred Bank<br>Alhambra Office<br>325 East Valley Blvd<br>Alhambra, CA 91801 |
| Preferred Bank<br>601 S Figueroa Street<br>29th Floor<br>Los Angeles, CA 90017-5734 | Sesame Workshop<br>G.P.O. Box 5587<br>New York, NY 10087-5587 | Sheldon J. Fleming, Esq.<br>2030 Main Street, Suite 1300<br>Irvine, CA 92614 |
| Signature Sales<br>7664 Golden Triangle Drive<br>Eden Prairie, MN 55344 | Thomas Licensing, LLC<br>~~Attn: Royalty Accounting~~<br>~~PO Box 911258~~<br>~~Dallas, TX 75391-0867~~<br>RTS Unable to Fwd 06-12-18 | Universal Studios Licensing<br>File 50789<br>Los Angeles, CA 90074-0789 |
| Viacom International, Inc.<br>PO Box 13732<br>Newark, NJ 07188 | Viacom International, Inc.<br>c/o MTV Networks<br>1515 Broadway, 41st Floor<br>New York, NY 10036-8995 | WELFULL GROUP CO., LTD.<br>11F, Jinjiang Manion<br>No. 111 Hushu South Road<br>Hangzhou,  China |
| WUXI TIANAO HOME TEXTILE<br>CO.,<br>No. 10 Xinyuan Road,<br>Qianzhou<br>Town Inustrial Park<br>Wuxi, Jiangsu,  China | YANCHENG CHANGHUA OUTDOO<br>PRODUCTS<br>No. 8 Longde Road<br>Dazonghu Town, Yandu District<br>Yancheng,  Jiangsu, China | YANCHENG CHANGHUA TRADING CO.<br>No. 8 Longde RD<br>Dazonghu Town<br>Yancheng, Jiangsu, China |
| YANGZHOU ZHENGHE<br>FOREIGN TRADE<br>No. 4, Jiazhuang Lane, Ximen<br>Yangzhou, Jiangsu,  China | YANGZHOU ZHONGYU<br>IMP.&EXP.COR<br>~~No 20, Yuqi Street, Yangzhou~~<br>~~Jiangsu, China~~<br>RTS Unable to Fwd 07-24-18 | Yellowstone Capital West, LLC<br>30 Broad Street<br>14th Floor, Suite 1462<br>New York, NY 10004 |
| Yu ("Brian") Zheng<br>19901 Tennessee Trail<br>Walnut, CA 91789 | ZHEJIANG ARTS&CRAFTS<br>IMPORT&EXPORT<br>12 Zhongshan Bel Road<br>Hangzhou,  China | ZHEJIANG LONGSHION LEISURE PRODUCT<br>No. 1 Yangshan Industrial Zone<br>Xinjian Town Jinyun County<br>Lishui City,  China |

51

1

2  ZHEJIANG ONETOUCH
   BUSINESS SERVICE          ZHEJIANG WUYI LUHU CRAFT &
   6th Floor, Building 1       LEISURE
3  No. 699, Wangshang Rd      Huanglong Industrial Area       ZHEJIANG YOUYIJIA INDUSTRY & TRADE
   Binjiang                   Zhejiang                        Yunfeng Maotian Industrial Area
   Hangzhou,  China           Wuyi, China                     Suichang County
4                                                             Zhejiang Province, China

5  Buyers Support Group, Inc.  ~~Wei Cheng, Edward Bo~~       C T Corporation System, As
   800 Nicollet Mall Ste 680   ~~McMillin, Adrianna~~         Representative
6  Minneapolis MN 55402-7032   ~~1053 E Covina Hills Rd~~     330 N Brand Blvd Ste 700
                               ~~Covina, CA 91724-3621~~      Glendale, CA 91203-2336
                               RTS – No Forwarding Address
7

8  Jamie Goodman, Esq.        **Address on POC #1**           Sedgwick LLP
   Entertainment One          Buyers Support Group, Inc.      ~~Attn Eric Danoff & Talcott N. Bates~~
   134 Peter Street, Suite 700  c/o Kohner, Mann & Kailas, S.C.  ~~333 Bush St., Fl. 30~~
9  Toronto, ON M5V 2H2        4650 North Port Washington Road  ~~San Francisco, CA 94104~~
   Canada                     Milwaukee, Wisconsin 53212      RTS Unable to Fwd 07-31-18

10

11 Meserve Mumper & Hughes    Lauren Deeb, Nelson Mullins Riley  Dong Guan Caidu Industrial Co., Ltd
   LLP                        & Scarborough LLP               c/o Law Ofc of Gary A Bemis
   800 Wilshire Blvd., Ste. 500  19191 S. Vermont Ave., #900    3870 La Sierra Ave, #239
12 Los Angeles, CA 90017-2611  Torrance, CA 90502             Riverside, CA 92505

13

14 **Request for Special Notice**  **Request for Special Notice**
   Factors Southwest LC       Dillman Sales, Inc.             East West Associates, Inc.
   Theodore Cohen, Esq.       c/co Thomas J. Polis, Esq.      14821 Northam St.
15 Sheppard Mullin et al      Polis & Associates             La Mirada, CA 90638
   333 Hope Street, 48th Floor  19800 McArthur Blvd., #1000
   Los Angeles, CA 90071-1448  Irvine, CA 92612-2433

16

17 Marita S Erbeck
   DRINKER BIDDLE & REATH
   LLP
18 600 Campus Drive
   Florham Park, NJ 07932-1047

19

20 **3.   SERVED BY PERSONAL DELIVERY, ~~OVERNIGHT MAIL, FACSIMILE TRANSMISSION~~ OR EMAIL**
   (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)
21 September 13, 2018, I served the following persons and/or entities by personal delivery, overnight mail
   service, or (for those who consented in writing to such service method), by facsimile transmission and/or
22 email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail
   to, the judge will be completed no later than 24 hours after the document is filed.

23  • **PERSONAL DELIVERY**
    • The Honorable Julia Brand, USBC, 255 East Temple Street, Los Angeles, CA 90012
24

25  • **VIA EMAIL:**
    • Raymond H. Aver    ray@averlaw.com
26  • Steven P Chang    heidi@spclawoffice.com,
      schang@spclawoffice.com,assistant1@spclawoffice.com,attorney@spclawoffice.com;g9806@notify.
      cincompass.com;chenghr75251@notify.bestcase.com
27  • Theodore A Cohen    tcohen@sheppardmullin.com, amontoya@sheppardmullin.com
    • Lauren A Deeb    lauren.deeb@nelsonmullins.com,
28    zora.thomas@nelsonmullins.com;lori.stewart@nelsonmullins.com

ACTIVE\64185774.v3-9/12/18

1

- Lei Lei Wang Ekvall    lekvall@swelawfirm.com,
  csheets@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com

2

- Michael G Fletcher    mfletcher@frandzel.com, sking@frandzel.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com

3

- Stella A Havkin    stella@havkinandshrago.com,
  havkinlaw@earthlink.net;r49306@notify.bestcase.com

4

- Bradford G Hughes    bhughes@Clarkhill.com, scontreras@clarkhill.com
- Shanna Kaminski    skaminski@schaferandweiner.com, pjozwiak@schaferandweiner.com

5

- Mette H Kurth    mkurth@foxrothschild.com, mette-kurth-7580@ecf.pacerpro.com
- Alvin Mar    alvin.mar@usdoj.gov

6

- Robert S Marticello    Rmarticello@swelawfirm.com,
  csheets@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com

7

- Thomas J Polis    tom@polis-law.com, paralegal@polis-law.com;r59042@notify.bestcase.com
- Stephen Reider    sreider@goeforlaw.com,
  kmurphy@goeforlaw.com;campbellwr79778@notify.bestcase.com

8

- Ryan M Salzman    ryan.salzman@dbr.com, willie.ackart@dbr.com

9

- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Reed S Waddell    rwaddell@frandzel.com, sking@frandzel.com

10

- Gerrick Warrington    gwarrington@frandzel.com, dwise@frandzel.com
- Sharon Weiss    sharon.weiss@bdplaw.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28